UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| | : | |
| IN RE: MERCK MUMPS | : | Master File No. 2:12-cv-03555 |
| VACCINE ANTITRUST | : | |
| LITIGATION | : | ORAL ARGUMENT REQUESTED |
| | : | |
| | : | |
| THIS DOCUMENT RELATES TO: | : | |
| | : | |
| ALL ACTIONS | : | |
| | : | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MERCK & CO., INC.'S
MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**

Hollis Salzman
Bernard Persky (*pro hac vice* pending)
Kellie Lerner
**LABATON SUCHAROW LLP**
140 Broadway, 34th Floor
New York, NY 10005
Telephone: (212) 907-0700
hsalzman@labaton.com
bpersky@labaton.com
klerner@labaton.com

Jeffrey L. Kodroff
John A. Macoretta
Mary Ann Geppert
**SPECTOR ROSEMAN KODROFF
& WILLIS, P.C.**
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
jkodroff@srkw-law.com
jmacoretta@srkw-law.com
mgiorno@srkw-law.com

Plaintiffs' Interim Co-Lead Counsel

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................1

STATEMENT OF FACTS .....................................................................2

ARGUMENT...................................................................................5

    I.      The Complaint Satisfies All Applicable Pleading Standards. ...............................5

    II.     Plaintiffs' Section 2 Claims Are Legally Sufficient. .............................................6

          A.     Plaintiffs Have Sufficiently Alleged The Type Of Exclusionary Conduct Prohibited By The Sherman Act. ...............................7

               1.     Deception Is A Form Of Exclusionary Conduct That Violates The Antitrust Laws..........................................8

                     (a)     The Sherman Act's Legislative History Shows That A Main Purpose Of The Act Is To Prohibit A Monopolist's Deception.....................................8

                     (b)     There is No Finite List of Conduct that Violates the Sherman Act.........................................9

          B.     Plaintiffs Have Identified Sufficient Antitrust Injury Proximately Caused By Merck And, As Direct Purchasers, Have Standing To Bring Their Antitrust Claims. ...............................16

               1.     Plaintiffs Have Identified Sufficient Antitrust Injury Proximately Caused By Merck....................................16

               2.     As Direct Purchasers, Plaintiffs Have Standing To Bring Their Antitrust Claims................................20

    III.    The Federal Food, Drug and Cosmetic Act ("FDCA") Does Not Preempt Plaintiffs' Federal Antitrust And State Law Claims. ..........................................21

    IV.    Plaintiffs Have Standing To Sue Under The Consumer Protection Statutes Of Their Own States And Their Standing To Sue Under The Consumer Protection Statutes Of States Other Than Their Own Should Be Deferred Until Class Certification Proceedings. ..............................................25

    V.    Plaintiffs Klein And Sutter Have Sufficiently Alleged Consumer Protection Claims Under The Statutes Of Their Respective States.....................31

i

A.    Plaintiff Klein Has Alleged A Viable Claim Under New York's Consumer Protection Statute, N.Y. Gen. Bus. Law § 349......................31

B.    Plaintiff Sutter Has Alleged A Valid Claim Against Merck Under The New Jersey Consumer Fraud Act.....................................................35

VI.    Plaintiffs' Breach of Warranty Claims Are Legally Sufficient. ...........................39

A.    Merck's Representations Regarding The Efficacy Of The Mumps Vaccine In Its Product Labeling And Marketing Materials Constitute An Express Warranty.............................................................40

B.    Plaintiffs Have Adequately Stated A Claim For Breach Of The Implied Warranty Of Merchantability. .....................................................43

VII.    Plaintiffs' Breach Of Contract Claim Is Legally Sufficient. ...............................44

VIII.    Plaintiffs' Unjust Enrichment Claim Is Legally Sufficient. ................................46

CONCLUSION....................................................................................................................51

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abbott Labs. v. Alra Lab., Inc.*,
   No. 92 C 5806, 1993 WL 293995 (N.D. Ill. Aug. 4, 1993)....................................................23

*Abbott Labs. v. Mylan Pharm., Inc.*,
   No. 05-6561, 2007 WL 625496 (N.D. Ill. Feb. 23, 2007).....................................................20

*Allegheny Gen. Hosp. v. Phillip Morris, Inc.*,
   228 F.3d 429 (3d Cir. 2000) ................................................................................................46

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
   486 U.S. 492 (1988) ......................................................................................................10, 11

*Altronics of Bethlehem, Inc. v. Repco, Inc.*,
   957 F.2d 1102 (3d Cir. 1992)...............................................................................................43

*Am. Airlines v. Wolens*,
   513 U.S. 219 (1995) .............................................................................................................45

*Amchem Prods. v. Windsor*,
   521 U.S. 591 (1997) .............................................................................................................27

*American Cyanamid Corp. v. Connaught Labs., Inc.*,
   800 F.2d 306 (2d Cir. 1986) ................................................................................................37

*AmerisourceBergen Drug Corp. v. Allscripts Healthcare*,
   LLC., 10-cv-6087, 2011 WL 3241356 (E.D. Pa. July 29, 2011)..........................................47

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ..........................................................................................................5, 20

*Atl. Paper Box Co. v. Whitman's Chocolates*,
   844 F. Supp. 1038 (E.D.Pa.1994) .......................................................................................48

*In re Auto Refinishing Paint Antitrust Litig.*,
   515 F. Supp. 2d 544 (E.D. Pa. 2007)....................................................................................33

*Avenarius v. Eaton Corp.*,
   No. 11-09-SLR, 2012 WL 4903373 (D. Del. Oct. 16, 2012) ..........................................27, 30

*In re Bayer Corp. Combination Aspirin Prods. Marketing and Sales Practice Litig.*,
   701 F. Supp. 2d 356 (E.D.N.Y. 2010)..................................................................................24

*Bayete v. Ricci,*
    No. 12-1372, 2012WL 3024240 (3d Cir. July 25, 2012) ....................................................46

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ........................................................................... 5, 6, 20, 45

*Black Radio Network, Inc. v. Nynex Corp.,*
    44 F. Supp. 2d 565 (S.D.N.Y.1999) ...................................................................33

*Blessing v. Sirius XM Radio, Inc.,*
    756 F. Supp. 2d 445 (S.D.N.Y. 2010) ..........................................................27, 29

*Blue Cross and Blue Shield of New Jersey, Inc. v. Phillip Morris USA, Inc., et. al.,*
    344 F.3d 211, 218 (2d Cir. 2003) ......................................................................31

*Bosland v. Warnock Dodge, Inc.,*
    No. A-1369-06T5, 2007 WL 3085857 (N.J. App. Div. Oct. 18, 2007) ................................35

*In re Brand Name Prescription Drugs Antitrust Litig.,*
    123 F.3d 599 (7th Cir. 1997) ...........................................................................34

*Brasher v. Sandoz Pharms. Corp.,*
    Nos. CV-98-TP-2648-S, CV-98-TMP2650-S, 2001 WL 36403362 (N.D. Ala. Sept.
    21, 2001) ......................................................................................................24

*Bristol-Myers Squibb Co. v. Ben Venue Labs.,*
    90 F. Supp. 2d 540 (D.N.J. 2000) ......................................................................20

*Broadcom Corp. v. Qualcomm Inc.,*
    501 F.3d 297 (3d Cir. 2007) ...................................................................... passim

*Brownlee v. Applied Biosystems, Inc.,*
    No. C-88-20672-RPA, 1989 WL 53864 (N.D. Cal. Jan. 9, 1989).........................................12

*Bruesewitz v. Wyeth, Inc.,*
    No. 09-152, 2010 WL 3048323 (July 30, 2010)..........................................................22, 23

*Buckman Co v. Plaintiffs' Legal Committee,*
    531 U.S. 341 (2001) .....................................................................................23, 24

*Burtch v. Milberg Factors, Inc.,*
    662 F.3d 212 (3d Cir. 2011) ..............................................................................5

*In re Buspirone Patent Litig.,*
    185 F. Supp. 2d 363 (S.D.N.Y. 2002) ...................................................28, 29, 30

*Caldon, Inc. v. Advanced Measurement & Analysis Grp., Inc.,*
    515 F. Supp. 2d 565 (W.D. Pa. 2007) ...................................................................11

*In re Cardizem CD Antitrust Litig.*,
   105 F. Supp. 2d 618 (E.D. Mich. 2000) ......................................................... 18, 48

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*,
   148 F.3d 1080 (D.C.Cir. 1998) ...................................................................... 11

*Central Regional Employees Benefit Fund v. Cephalon Inc.*,
   No. 09-3418, 2009 WL 3245485 (D.N.J. Oct. 7, 2009) ...................................... 37

*In re Chocolate Antitrust Litig.*,
   602 F. Supp. 2d 538 (M.D. Pa. 2009) ........................................................ 29, 30

*City of Anaheim v. S. Cal. Edison Co.*,
   955 F.2d 1373 (9th Cir.1992) ........................................................................ 13

*City of New York v. Smokes-Spirits.com, Inc.*,
   911 N.E.2d 834 (N.Y. 2009) ......................................................................... 31

*Clark v. McDonald's Corp.*,
   213 F.R.D. 198 (D.N.J. 2003) ................................................................... 28, 30

*Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*,
   690 F.2d 1240 (9th Cir. 1982) ................................................................. 11, 23

*Conley v. Gibson*,
   335 U.S. 41 (1957) ..................................................................................... 5

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962) ..................................................................................... 13

*CoreStates Bank N.A. v. Cutillo*,
   723 A.2d 1053 (Pa. Super. Ct. 1999) ............................................................. 44

*Cox v. Microsoft Corp.*,
   8 A.D.3d 39 (N.Y. App. Div. 2004) ................................................................ 33

*Danvers Motor Co. v. Ford Motor Co.*,
   432 F.3d 286 (3d Cir. 2005) ..................................................................... 26, 39

*Davis v. S. Bell Tel. & Tel. Co.*,
   No. 89-2839-CIV-NESBIT, 1994 WL 912242 (S.D. Fla. 1994) ............................ 12

*Dawson ex rel. Thompson v. Ciba-Gelgy Corp., USA*,
   145 F. Supp. 2d 565 (D.N.J. 2001) ................................................................ 24

*In re DDAVP Indirect Purchaser Antitrust Litig.*,
   No. 05-cv-2237, 2012 WL 4932158 (S.D.N.Y. Oct. 17, 2012) ....................... 24, 29

*In re Digital Music Antitrust Litig.*,
  812 F. Supp. 2d 390 (S.D.N.Y. 2011) ................................................................... 29

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
  536 F. Supp. 2d 1129 (N.D. Cal. 2008) ................................................................ 34

*EBC, Inc. v. Clark Building Sys., Inc.*,
  618 F.3d 253 (3d Cir. 2010) ................................................................................. 46

*Erickson v. Pardus*,
  551 U.S. 89 (2007) .................................................................................................. 6

*Fleisher v. Fiber Composites, LLC*,
  No. 12-1326, 2012 WL 5381381 (E.D. Pa. Nov. 2, 2012) ............................. 40, 47

*In re Flonase Antitrust Litig.*,
  No. 610 F. Supp. 2d 409 (E.D. Pa. 2009) ............................................................. 50

*In re Ford Motor Co. E-350 Van Prods. Liab. Litig. (No. II)*,
  No. 03-4558, 2008 WL 4126264 (D.N.J. Sept. 2, 2008) ................................. 38, 49

*Ford Motor Co. v. Edgewood Props., Inc.*,
  No. 06-1278, 2007 WL 4526594 (D.N.J. Dec. 18, 2007) ..................................... 35

*Freeman Indus., LLC v. Eastman Chem. Co.*,
  172 S.W.3d 512 (Tenn. 2005) ............................................................................... 50

*In re G-Fees Antitrust Litig.*,
  584 F. Supp. 2d 26 (D.D.C. 2008) ........................................................................ 48

*Goodman v. PPG Indus., Inc.*,
  849 A.2d 1239 (Pa. Super. Ct. 2004) ................................................................... 42

*In re Grand Theft Auto Video Game Consumer Litig.*,
  No. 06 MD 1739(SWK)(MHD), 2006 WL 3039993 (S.D.N.Y. Oct. 25, 2006) .............. 29

*Gulfstream III Assocs. Inc. v. Gulfstream Aerospace Corp.*,
  995 F.2d 425 (3d Cir. 1993) ................................................................................. 21

*In re Hypodermic Prods. Antitrust Litig.*,
  No. 05-CV-1602, 2007 WL 1959225 (D.N.J. June 29, 2007) ..................... 28, 30, 49

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977) .............................................................................................. 21

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010) ................................................................................... 6

*Int'l Travel Arrangers, Inc. v. W. Airlines, Inc.*,
    623 F.2d 1255 (8th Cir. 1980) .......................................................................11

*Israel v. Baxter Labs., Inc.*,
    466 F.2d 272 (D.C. Cir. 1972) ....................................................... 11, 22, 23, 24

*J&R Ice Cream Corp. v. Cal. Smoothie Licensing Corp.*,
    31 F.3d 1259 (3d Cir. 1994) ..........................................................................36

*Johansson v. Cent. Garden & Pet Co.*,
    804 F. Supp. 2d 257 (D.N.J. 2011) ................................................................40

*In re K-Dur Antitrust Litig.*,
    338 F. Supp. 2d 517 (D.N.J. 2004) ....................................................19, 28, 30, 47

*Kaczmarek v. Int'l Business Machines Corp.*,
    186 F.R.D. 307 (S.D.N.Y. 1999) ....................................................................45

*Kenepp v. Am. Edwards Labs.*,
    859 F. Supp. 809 (E.D. Pa. 1994) ..................................................................41

*Kilpatrick v. Sheet Metal Workers Int'l Ass'n Local Union No. 19*,
    No. iv A. 96-4862, 1996 WL 635691 (E.D. Pa. Oct. 30, 1996) ...........................40

*Klingel's Pharmacy of Baltimore City v. Sharp & Dohme*,
    64 A. 1029 (Md. 1906)...................................................................................8

*Lawlor v. Cablevision Sys. Corp.*,
    839 N.Y.S. 2d 433 (N.Y. Sup. Ct. 2007)..........................................................31

*Leader Theatre Corp. v. Randforce Amusement Corp.*,
    58 N.Y.S.2d 304 (N.Y. Sup. Ct. 1945).............................................................34

*Lee v. Carter-Reed Co.*,
    4 A.3d 561, 577 (N.J. 2010) ..........................................................................35

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007) ......................................................................................8

*LePage's Inc. v. 3M*,
    324 F.3d 141 (3d Cir. 2003) (*en banc*)................................................. 6, 7, 9, 13

*Lfaivre v. KV Pharmaceutical Co.*,
    636 F.3d 935 (8th Cir. 2011) .........................................................................24

*Link v. Mercedes-Benz of N. Am.*,
    788 F.2d 918 (3d Cir. 1986) ..........................................................................21

*In re Lorazepam & Clorazepate Antitrust Litig.*,
  295 F. Supp. 2d 30 (D.D.C. 2003) ...................................................................47

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) .........................................................................................39

*Marini v. Adamo*,
  812 F. Supp. 2d 243 (E.D.N.Y. 2011)...............................................................31

*McBride v. Life Ins. Co. of Va.*,
  190 F. Supp. 2d 1366 (M.D. Ga. 2002)..............................................................48

*In re Mercedes-Benz Tele Aid Contract Litig.*,
  257 F.R.D. 46 (D.N.J. 2010)..............................................................................49

*Merican, Inc. v. Caterpillar Tractor Co.*,
  713 F.2d 958 (3d Cir. 1983) ..............................................................................21

*Messerole v. Tynberg*,
  36 How. Pr. 14 (N.Y.C.P. Special Term 1868) ...................................................8

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
  175 F. Supp. 2d 593 (S.D.N.Y. 2001) ................................................................32

*Mobil Oil Corp. v. Joshi*,
  609 N.Y.S.2d 214 (N.Y. App. Div. 1995) .................................................... 34, 35

*N.J. Citizens Action v. Schering Plough Corp.*,
  842 A.2d 174 (N.J. App. Div. 2003) ..................................................................38

*In re Neurontin Antitrust Litig.*,
  MDL No. 1479, 2009 WL 2751029 (D.N.J. Aug. 28, 2009) ........................ 19, 20

*New York v. Feldman*,
  210 F. Supp. 2d 294 (S.D.N.Y. 2002) .................................................... 31, 32, 33

*New York v. Intel Corp.*,
  No. 09-00827-JJF (D. Del. Nov. 4, 2009) ..........................................................12

*Ocasio v. Prison Health Servs.*,
  979 A.2d 352 (Pa. Super. Ct. 2009) ...................................................................44

*Oce North America, Inc. v. MCS Servs., Inc.*,
  795 F. Supp. 2d 337 (D. Md. 2011) ...................................................................16

*Ortiz v. Fibreboard Corp.*,
  527 U.S. 815 (1999) ..................................................................................... 27, 28

*Oshy v. Koufa Realty Corp.*,
951 N.Y.S.2d 87 (N.Y. Sup. Ct. 2012).............................................................31

*Pappas v. Unum Life Ins. Co.*,
No. 97-cv-7162, 2000 WL 1137730 (E.D. Pa. Aug. 10, 2000)............................47

*Parkinson v. Guidant Corp.*,
315 F. Supp. 2d 741 (W.D. Pa. 2004) ...............................................................40

*Payton v. County of Kane*,
308 F.3d 673 (7th Cir. 2002) ...........................................................................28

*In re Pharm. Indus. Average Wholesale Price Litig.*,
252 F.R.D. 83 (D. Mass. 2008)..........................................................................45

*Phillips v. County of Allegheny*,
515 F.3d. 224 (3d Cir. 2008) ..............................................................................6

*Prescription Counter v. Amerisourcebergen Corp.*,
No. 04-5802, 2007 WL 3511301 (D.N.J. Nov. 14, 2007)........................ 35, 36, 37

*In re Processed Egg Prods. Antitrust Litig.*,
851 F. Supp. 2d 867 (E.D. Pa. 2012)..................................................................26

*Prohias v. Pfizer, Inc.*,
490 F. Supp. 2d 1228 (S.D. Fla. 2007)...............................................................24

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
148 F.3d 283 (3d Cir. 1992) ..............................................................................26

*Prudential Ins. Co. of Am. v. Clark Consulting, Inc.*,
548 F. Supp. 2d 619 (N.D. Ill. 2008)..................................................................48

*Research in Motion Ltd. v. Motorola, Inc.*,
644 F. Supp. 2d 788 (N.D. Tex. 2008)...............................................................12

*Revell v. Port Auth.*,
598 F.3d 128 (3d Cir. 2010) ..............................................................................20

*In re: Rezulin Prods. Liab. Litig.*,
390 F. Supp. 2d 319 (S.D.N.Y. 2005) ............................................................ 32, 33

*Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947) ...........................................................................................24

*Rios v. State Farm Fire and Cas. Co.*,
469 F. Supp. 2d 727 (S.D. Iowa 2007)...............................................................49

*Robinson v. Johnson*,
  313 F.3d 128 (3d Cir. 2002) ............................................................................46

*Sanderson v. Culligan Int'l Co.*,
  415 F.3d 620 (7th Cir. 2005) ..........................................................................16

*Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*,
  401 F.3d 123 (3d Cir. 2005) ............................................................................14

*Schachar v. Am. Academy of Opthalmology, Inc.*,
  870 F.2d 397 (7th Cir. 1989) ...........................................................................14

*Schering-Plough Corp. Intron/Temodar Consumer Class Action*,
  No. 2:06-cv-5774, 2009 WL 2043604 (D.N.J. July 10, 2009) .............................37

*Schirmer v. Principal Life Ins. Co.*,
  No. 08-cv-2406, 2008 WL 4787568 (E.D. Pa. Oct. 29, 2008) ............................40

*Securitron Magnalock Corp v. Schnabolk*,
  65 F.3d 256 (2d Cir. 1995) ..............................................................................32

*Sheet Metal Workers Nat'l Health Fund v. Amgen,Inc.*,
  No. 07-5295, 2008 WL 3833577 (D.N.J. Aug. 13, 2008) ..........................34, 30

*Singer v. AT&T Corp.*,
  185 F.R.D. 681 (S.D. Fla. 1998) .................................................................45, 50

*Smajlaj v. Campbell Soup Co.*,
  782 F. Supp. 2d 84 (D.N.J. 2011) .....................................................................38

*Sowers v. Johnson & Johnson Med., Inc.*,
  867 F. Supp. 306 (E.D. Pa. 1994) .....................................................................41

*Standard Oil Co. v. United States*,
  221 U.S. 1 (1911) .............................................................................................8

*State by Lefkowitz v. Colorado State Christian College of Church of Inner Power, Inc.*,
  346 N.Y.S.2d 482 (N.Y. Sup. Ct. 1973) .............................................................31

*State Oil Co. v. Khan*,
  522 U.S. 3 (1997) .............................................................................................8

*Stearns Airport Equip. v. FMC Corp.*,
  170 F.3d 518 (5th Cir. 1999) ......................................................................14, 15

*Swierkiewicz v. Sorema*,
  534 U.S. 506 (2002) ...................................................................................44, 45

*Tender Touch Rehab Servs., LLC v. Brighten at Bryn Mawr*,
   No. Civ.A 11-7016, 2012 WL 993532 (E.D. Pa. Mar. 23, 2012)..........................................20

*In re Terazosin Hydrochloride Antitrust Litig.*,
   220 F.R.D. 672 (S.D. Fla. 2004) ........................................................................................49

*Two Queens, Inc. v. Scoza*,
   745 N.Y.S.2d 517 (N.Y. App. Div. 2002) ..........................................................................34

*United States ex rel. Krahling v. Merck & Co., Inc.*,
   No. 10-cv-04374-CDJ (E.D. Pa.)....................................................................................3, 10

*United States v. Grinnell Corp.*,
   384 U.S. 563 (1966) .......................................................................................................6, 7

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) ............................................................................... 11, 17, 18

*Va. Vermiculite, Ltd. v. WR Grace & Co.*,
   156 F.3d 535 (4th Cir. 1998) ..............................................................................................18

*Van Horn v. Van Horn*,
   20 A. 485 (N.J. 1890) ..........................................................................................................8

*Varacello v. Mass. Mut. Life Ins. Co.*,
   752 A.2d 807 (N.J. App. Div. 2000) ....................................................................................38

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
   382 U.S. 172 (1965) .....................................................................................................11, 23

*Warner-Lambert Co. v. Purepac Pharm. Co.*,
   No. 99-5948, 2000 WL 34213890 (D.N.J. Dec. 22, 2000) ...................................................23

*Weaver v. Chrysler Corp.*,
   172 F.R.D. 96 (S.D.N.Y. 1997) ................................................................................... 33, 34

*In re Wellbutrin SR/Zyban Antitrust Litig.*,
   281 F. Supp. 2d 751 (E.D. Pa. 2003)....................................................................................18

*In re Wellbutrin XL Antitrust Litig.*,
   260 F.R.D. 143 (E.D. Pa. 2009)....................................................................................30, 50

*West Penn Allegheny Health System, Inc. v. UPMC*,
   627 F.3d 85 (3d Cir. 2010) ...........................................................................................13, 14

*Winer Family Trust v. Queen*,
   503 F.3d 319 (3d Cir. 2007) ................................................................................................26

*Wiseberg v. Toyota Motor Corp.*,
No. 11-3776, 2012 WL 1108542 (D.N.J. Mar. 30, 2012) ....................................................48

*Woods Exploration & Producing Co. v. Aluminum Co. of Am.*,
438 F.2d 1286 (5th Cir. 1977) ...........................................................................................23

*Wyeth v. Levin*,
555 U.S. 555 (2009) ...........................................................................................................22

## RULES & STATUTES

Fed. R. Civ. P. 8 ..................................................................................................passim

Fed. R. Civ. P. 12(b)(6) ................................................................................ 6, 18, 40, 46

Fed. R. Civ. P. 23 ................................................................................................passim

The Sherman Act ................................................................................................passim

13 Pa. Cons. Stat. Ann. § 2313 ..............................................................................40

13 Pa. Cons. Stat. Ann. § 2314 ..............................................................................43

New Jersey Consumer Fraud Act .......................................................................passim

N.J. Stat. Ann. §§ 56:8-1, *et seq.* ..........................................................................35

N.Y. Gen. Bus. Law § 349 ..........................................................................31, 33, 34

## OTHER AUTHORITIES

1 NEWBERG ON CLASS ACTIONS § 2.05 (3d ed. 1992) ...................................................26

1 NEWBERG ON CLASS ACTIONS § 2:7 (4th ed. 2008) ...................................................27

2 PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 338a ....................................17

21 CONG. REC. 1351 (1890) ..................................................................................8

MANUAL FOR COMPLEX LITIGATION (FOURTH) § 22.634 (2004)...................................45

RESTATEMENT OF RESTITUTION § 1 cmt. d (1937)......................................................47

## MISCELLANEOUS

Arik Hesseldahl, *The Intel-AMD Settlement: A Play-by-Play*, BUS. WK., Nov. 15, 2009............12

Article 82 of the EC Treaty and Article 54 of the EEA Agreement at 13, 17, 2009 O.J. (C 227) ..........................................................................................................................12

*Determining the Safety and Efficacy of Vaccines to Protect Against Viruses that Infect the Central Nervous System* ................................................................................................ 1

European Commission Decision of 13 May 2009 Relating to a Proceeding Under Article 82 of the EC Treaty and Article 54 of the EEA Agreement at 13, 17, 2009 O.J. (C 227) ..................................................................................................................................... 12

*In re Intel Corp.*, No. 9341 (Dec. 6, 2009) .............................................................................. 12

*Intel Corp.,* No. 9341 (Aug. 4, 2010) ...................................................................................... 13

## PRELIMINARY STATEMENT

Plaintiffs, Andrew Klein, M.D., John I. Sutter, M.D., and Chatom Primary Care, P.C. ("Plaintiffs"), respectfully submit this Memorandum of Law in Opposition to Merck & Co., Inc.'s ("Merck") Motion to Dismiss the operative Complaint in this action.

This case is about Merck's total dominance and 100% control of the U.S. Market for Mumps Vaccine[1] (the "Relevant Market").  Merck does not wield this monopoly power through the development of a superior product or due to its business acumen, but through a decade-long campaign of lies and deceit regarding the efficacy of its Mumps Vaccine.  After two unprecedented mumps outbreaks, the public is only now discovering that Merck's vaccine is *not* as effective as claimed.  Merck has known for years that it could not possibly deliver on its claim of at least 95% efficacy.  Instead of disclosing the failings of its vaccine – and spurring the inevitable development of superior alternatives by competitors – Merck protected its monopoly by willfully concealing the truth about the diminished efficacy of its Mumps Vaccine in product labeling, marketing materials and public statements during recent mumps outbreaks.  Merck even went so far as to falsely declare that "[it has] absolutely no information to suggest that there is any problem with the vaccine."  (Consolidated Amended Complaint ("CAC" or "Complaint") ¶ 100).  U.S. government agencies have, by now, lost faith in Merck's representations regarding the efficacy of its vaccine.  The  U.S. Food and Drug Administration ("FDA") is currently examining the vaccine's effectiveness because recent mumps outbreaks "indicat[e] lower vaccine efficacy than previously estimated,"[2] and the National Institutes of Health ("NIH") is now

---

[1] As used herein, the term "Mumps Vaccine" includes Merck's M-M-R®II and ProQuad® vaccines.

[2] Steven Rubin, Ph.D., *Determining the Safety and Efficacy of Vaccines to Protect Against Viruses that Infect the Central Nervous System*,

*(continued)*

1

funding the development of a new vaccine because the recent outbreaks "strongly suggest that the current vaccine is not effective." (CAC ¶ 117).

This case is not about conjecture or speculation. As set forth in Plaintiffs' well-pleaded Complaint, the facts underlying this lawsuit come from the eyewitness accounts of not one, but two former Merck virologists who witnessed firsthand the desperate measures Merck was willing to take to conceal the diminished efficacy of its Mumps Vaccine. These measures, which included manipulating test data, falsifying test results, intimidating employees and destroying evidence, were all admittedly undertaken by Merck as a "business decision" to maintain its exclusive license to sell Mumps Vaccine in the U.S. (CAC ¶ 70).

As Merck would have it, even accepting these well-pleaded allegations as true (as this Court must do on a motion to dismiss), Plaintiffs fail to articulate any legally cognizable claim. As set forth below, each of Merck's arguments should be rejected out of hand as an unwarranted attempt to limit the application of federal antitrust law, as well as certain state law and common law remedies. Thus, Plaintiffs' claims for monopolization in violation of Section 2 of the Sherman Act, violations of state consumer protection laws, breach of contract, breach of Pennsylvania's express and implied warranty laws, and unjust enrichment should be allowed to proceed.

## STATEMENT OF FACTS

Merck originally obtained government approval to sell its Mumps Vaccine in 1967. (CAC ¶ 24). At the time, Merck conducted field studies to determine that the vaccine had an

_____

*(continued)*

http://www.fda.gov/BiologicsBloodVaccines/ScienceResearch/BiologicsResearchAreas/ucm127315.htm
(last updated Nov. 11, 2011).

efficacy rate of 95% or higher, *i.e.*, 95% of those given the vaccine were considered immunized against mumps.  (CAC ¶¶ 34).  Because of the manner by which Merck creates its Mumps Vaccine, the efficacy of the vaccine has significantly diminished over the past forty-five years.  (CAC ¶ 5).  The foundation of Merck's Mumps Vaccine is an attenuated virus – a virus unable to replicate enough in a patient to cause illness, but still able to invoke an immune response capable of protecting against future infection – which is created  by "passaging" the virus through a series of cell cultures or animal embryos.  (CAC ¶ 5).  Over time, Merck's continued passaging of the attenuated virus, from which its original Mumps Vaccine was created, has altered the virus and degraded the vaccine's efficacy.  (CAC ¶ 6).

Merck's campaign of deception began in the late 1990s.  After it initiated new efficacy testing of its Mumps Vaccine, Merck found that initial testing methodologies could not replicate the 95% efficacy rate achieved back in 1967.  (CAC ¶¶ 7-9, 38-53).  Merck then resorted to falsifying test data to obtain the desired efficacy.  (CAC ¶¶ 9, 54-63, 65).  Merck covered up its fraudulent testing by destroying evidence, lying to the FDA, offering financial incentives to cooperative employees and threatening Stephen Krahling,[3] a virologist in Merck's Vaccine division at the time, with incarceration if he reported the fraud.  (CAC ¶¶ 10, 62, 67-69, 71-75).

Despite knowing full well that its Mumps Vaccine had significantly diminished in efficacy, over the next decade Merck continued to promote and market the vaccine as having an efficacy rate of at least 95%.   Merck not only misrepresented and concealed the true efficacy of its vaccine on its package insert and labeling (CAC ¶¶ 84-86), but also in applications submitted to the FDA and the European Medicines Agency ("EMA") for approval of the vaccine (CAC ¶¶

---

[3] Mr. Krahling is a relator in the related *qui tam* action, *United States ex rel. Krahling v. Merck & Co., Inc.*, No. 10-cv-04374-CDJ (E.D. Pa.).

87-91), and in an application for a labeling change as to the potency of its M-M-R®II vaccine (CAC ¶¶ 92-94).  Moreover, during the unprecedented mumps outbreaks in 2006 and 2009, Merck failed to inform the U.S. government or public of its knowledge of the vaccine's diminished efficacy, instead declaring that it had no reason to believe there was a problem with the vaccine. (CAC ¶¶ 95-110).

As a result of these false representations and omissions regarding its Mumps Vaccine, Merck has been able to unlawfully maintain a monopoly in the U.S. Market for Mumps Vaccine and has foreclosed potential competitors from entering the market for over a decade.  The artificially high efficacy bar Merck established through fraud and concealment has discouraged other manufacturers from investing the considerable resources necessary to compete in the U.S. Market for Mumps Vaccine.  (CAC ¶ 111).  While the NIH funded the development of a new vaccine last year, if the public had known before the historic mumps outbreaks in 2006 and 2009 that Merck's Mumps Vaccine was not as effective as claimed, new vaccines would have likely been developed much earlier.  (CAC ¶¶ 114-20).

As a result of its unlawful creation of barriers to entry and exclusion of competition from the market, Merck has been able to charge artificially inflated prices for its Mumps Vaccine. Between December 1999 and April 2012, Merck increased the prices it charged for M-M-R®II vaccine by an astonishing 85%.  (CAC ¶ 125).  Plaintiffs and members of the proposed Class, who purchased Mumps Vaccine directly from Merck during the past 13 years, have all been forced to pay such artificially inflated prices for Mumps Vaccine because Merck has foreclosed all competition, including price competition.  (CAC ¶¶ 12-14, 126, 167, 174-75, 185-86, 195-96).

**ARGUMENT**

**I.       The Complaint Satisfies All Applicable Pleading Standards.**

To withstand a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief *that is plausible* on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 697 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (emphasis added).  As Rule 8(a)(2) of the Federal Rules of Civil Procedure provides, a plaintiff must set forth "a short and plain statement of the claim showing that the pleader is entitled to relief."  Its purpose is to "'give the defendant fair notice of what the … claim is and the grounds upon which is rests.'" *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 335 U.S. 41, 47 (1957)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.[4]

Importantly, "[a]sking for plausible grounds . . . *does not impose a probability requirement* at the pleading stage," *Twombly*, 550 U.S. at 556 (emphasis added), nor does it require "'detailed factual allegations.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly* at 555).  Rather, Rule 8 "simply calls for enough fact to raise a reasonable expectation that discovery will reveal

---

[4] The Third Circuit does not have an anomolous, "particular formulation" of the plausibility standard, as suggested by Merck.  Memorandum of Law in Support of Merck's Motion to Dismiss Plaintiffs' Amended Complaint ("MTD") at 6, (ECF No. 40-1).  Moreover, the case relied upon by Merck for this proposition, *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 228 (3d Cir. 2011), is inapposite. *Burtch* involved an analysis of a Section 1 claim, and whether the circumstantial evidence pleaded was sufficient to plausibly infer an agreement among the conspirators, or whether plaintiff had merely pleaded parallel conduct.  By contrast, this case presents a Section 2 claim, where the question of parallel conduct and agreements among conspirators are not at issue.  To the more point, Plaintiffs' factual allegations regarding Merck's monopoly and violation of various states' laws are not based on circumstantial evidence but, rather, detailed information and direct evidence regarding Merck's anticompetitive conduct.

evidence of illegal[ity]." *Twombly*, 550 U.S. at 556; *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 319 (3d Cir. 2010).

When ruling on a defendant's motion to dismiss, this Court must accept as true all of the well-pleaded factual allegations contained in the complaint. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citing *Twombly*, 550 U.S. at 555-56); *Phillips v. County of Allegheny*, 515 F.3d. 224, 231 (3d Cir. 2008) ("The Supreme Court also reaffirmed that, on a Rule 12(b)(6) motion, the facts alleged must be taken as true").  Based on Plaintiffs' detailed Complaint, and the reasons set forth herein, Merck's motion to dismiss must be denied.

## II.    <u>Plaintiffs' Section 2 Claims Are Legally Sufficient.</u>

Liability under Section 2 of the Sherman Act results from  "'1) the possession of monopoly power in [a] relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'"  *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 306-07 (3d Cir. 2007) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)).  The Complaint pleads facts sufficient to show that Merck possesses monopoly power in the relevant market,[5] and that Merck willfully maintained that power not through the development of a superior product, but by exclusionary, anticompetitive acts, including concealing and misrepresenting the diminished efficacy of its Mumps Vaccine.

"A monopolist willfully acquires or maintains monopoly power when it competes on some basis other than the merits."  *LePage's Inc. v. 3M*, 324 F.3d 141, 147 (3d Cir. 2003) (*en banc*).  Plaintiffs allege that Merck willfully and illegally maintained monopoly power in the

---

[5] Merck does not contest that Plaintiffs have pleaded adequate product and geographic markets and Merck's power in those markets.

U.S. Market for Mumps Vaccine by, among other acts, misrepresenting and concealing the true efficacy of its vaccine on its package inserts and labeling (CAC ¶¶ 84-86); in applications submitted to the FDA and the EMA for approval of the vaccine (CAC ¶¶ 87-91); in an application for a labeling change on the potency of its M-M-R®II vaccine (CAC ¶¶ 92-94); and during two recent, unprecedented mumps outbreaks when it declared the vaccine worked just fine.  (CAC ¶¶ 95-110).  Moreover, as the historic 2006 and 2009 mumps outbreaks among highly vaccinated populations demonstrate, Merck did not maintain its monopoly through "superior product, business acumen, or historic accident," *Grinnell*, 384 U.S. at 570-71, nor competition "on the merits," *LePage's*, 324 F.3d at 147, but rather through willful and anticompetitive deceit.  Based on Plaintiffs' well-pleaded allegations, Plaintiffs have satisfied the requirements of a Section 2 claim.

> ### A.    Plaintiffs Have Sufficiently Alleged The Type Of Exclusionary Conduct Prohibited By The Sherman Act.

Despite Plaintiffs' detailed Complaint, Merck argues that the Sherman Act condemns only certain types of willful conduct.  Merck asserts that a widespread, long-running campaign of misrepresentation and concealment, which created barriers to entry and foreclosed competition, does not fit within its narrow (and self-serving) definition of anticompetitive behavior prohibited by the antitrust laws.  To the contrary, however, Supreme Court and Third Circuit precedent, as well as the legislative purpose of the Sherman Act, make abundantly clear that there is no finite list of conduct that violates the antitrust laws.

1.    **Deception Is A Form Of Exclusionary Conduct That Violates The Antitrust Laws.**

      (a)      **The Sherman Act's Legislative History Shows That A Main Purpose Of The Act Is To Prohibit A Monopolist's Deception.**

When the Sherman Act was enacted "unfair competition" under the common law was grounded in preventing injury to a competitor through misrepresentation. *See Klingel's Pharmacy of Baltimore City v. Sharp & Dohme*, 64 A. 1029, 1030 (Md. 1906) ("[A]n action will lie for a combination or conspiracy by fraudulent and malicious acts to drive a trader out of business, resulting in damage.") (citing *Van Horn v. Van Horn*, 20 A. 485, 486 (N.J. 1890)); *Messerole v. Tynberg*, 36 How. Pr. 14 (N.Y.C.P. Special Term 1868) ("The market is closed against no one who, in a fair and honest spirit of rivalry, seeks to monopolize the entire trade . . . but the elements of fraud, deceit or malappropriation of another's rights can receive no countenance from courts of equitable jurisdiction."). The Sherman Act's legislative history manifests a clear intent to incorporate the prevailing common law on unfair competition – common law that condemned deception in the marketplace.[6] The Supreme Court has repeatedly said that the federal antitrust laws are the federal common law on unfair competition.[7]

---

    [6] As Senator Hoar explained at the time, Section 2 of the Sherman Act sought "to extend the common-law principles, which protected fair competition in trade in old times in England, to international and interstate commerce in the United States." 21 CONG. REC. 1351, 3152 (1890).

    [7] *See Standard Oil Co. v. United States*, 221 U.S. 1, 60 (1911) ("[T]he standard of reason which had been applied at the common law and in this country in dealing with subjects of the character embraced by the [Sherman Act] was intended to be the measure used for the purpose of determining whether, in a given case, a particular act had or had not brought about the wrong against which the statute provided."); *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 899 (2007) (stating that from its inception, the Sherman Act was treated "as a common-law statute"); *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) (noting that it is the accepted "view that Congress expected the courts to give shape to the statute's broad mandate by drawing on common-law tradition") (quotation marks and citation omitted).

      **(b)**      <u>**There is No Finite List of Conduct that Violates the Sherman**</u>
<u>**Act.**</u>

Merck incorrectly argues that there are only eight "[r]ecognized forms of exclusionary conduct sufficient to sustain a claim for monopolization" and that anticompetitive and exclusionary acts of deception are not among them.  (MTD at 9-10).  Merck's myopic construction of the Sherman Act is squarely refuted by the Third Circuit, which makes clear that "[a]nticompetitive conduct can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties." *LePage's*, 324 F.3d at 152 (internal quotation marks omitted).  "[A] monopolist is not free to take certain actions that a company in a competitive (or even oligopolistic) market may take, because there is no market constraint on a monopolist's behavior."  *Id*. at 151-52.  Indeed, adopting Merck's self-serving interpretation of the Sherman Act would effectively eviscerate a large portion of the antitrust laws.

The breadth of conduct subject to antitrust scrutiny was addressed by the Third Circuit in *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007).  In that case, Qualcomm held a patent for technology adopted in industry-wide standards necessary to ensure interoperability among cell phone equipment.  The standard-setting organization ("SSO") tasked with selecting which technology would go into the standards chose to include Qualcomm's technology only after Qualcomm committed to license its technology to competitors on fair, reasonable and non-discriminatory ("FRAND") terms.  *See id.* at 304.  Broadcom alleged that Qualcomm deceived the SSO and, in so doing, violated the antitrust laws, when it failed to live up to its promise to license the technology on FRAND terms.  *See id.*  In considering whether Qualcomm's alleged deception amounted to an antitrust violation, the Third Circuit noted that a patent holder who deceives an SSO regarding the cost or performance characteristics of its technology can obtain

an unfair advantage and obscure the relative merits of alternatives.  *See id.* at 313.  Thus, the Court held that where a patent holder intentionally and falsely agrees to license essential technology on FRAND terms, and, in so doing, deceives an SSO into incorporating the technology in a standard, the patent holder's subsequent breach of that promise constitutes an anticompetitive act under the federal antitrust laws.  *See id.* at 314.

Merck's conduct is analogous to what was found sufficient to state a Section 2 claim in *Broadcom*.  Here, Merck engaged in unlawful exclusionary conduct when it maintained its exclusive license to sell Mumps Vaccine in the U.S. Market by concealing the diminished efficacy of the vaccine.  Despite its ongoing and continuous duty to provide the FDA with accurate information on the efficacy of its Mumps Vaccine,[8] Merck created significant barriers to entering the U.S. Market by falsely representing an artificial efficacy rate and failing to disclose what it knew about the Mumps Vaccine's diminished efficacy to the FDA.  Competitors, customers and regulators believed Merck's lies in continuing to allow Merck, via its exclusive license, to be the sole provider of Mumps Vaccine in the U.S Market.  As in *Broadcom*, Merck's deceptive conduct and breach of its duty – here, to provide accurate information to the FDA and the public – constitutes an anticompetitive act in violation of Section 2 of the Sherman Act.  The anticompetitive nature of Merck's deceit is only underscored by the admission of one of its employees, who explained that concealing the diminished efficacy of the vaccine was done as a "business decision" (CAC ¶ 70) to maintain and continue Merck's total monopoly in the market.  *See Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 (1988) ("[U]nethical

---

[8]  *See* Relators' Memorandum in Opposition to Merck's Motion to Dismiss ("Relators' Opposition") at 10, *United States ex rel. Krahling v. Merck & Co., Inc.*,  No. 10-cv-04374-CDJ (E.D.Pa. Oct. 9, 2012), ECF No. 47.

and deceptive practices can constitute abuses of administrative or judicial processes that may

result in antitrust violations.").

The *Broadcom* decision readily comports with Supreme Court precedent and numerous

cases holding that the enforcement of a legal monopoly provided by a patent or agency approval

procured through fraud may violate Section 2.  *See, e.g.*, *Walker Process Equip., Inc. v. Food

Mach. & Chem. Corp.*, 382 U.S. 172, 174 (1965); *see also Clipper Exxpress v. Rocky Mountain

Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1261 (9th Cir. 1982) (holding "the fraudulent

furnishing of false information to an agency in connection with an adjudicatory proceeding can

be the basis for antitrust liability"); *Israel v. Baxter Labs., Inc.*, 466 F.2d 272, 278-79 (D.C. Cir.

1972) ("No actions which impair the fair and impartial functioning of an administrative agency

should be able to hide behind the cloak of an antitrust exemption.").

District courts in the Third Circuit likewise condemn anticompetitive deception.  In

*Caldon, Inc. v. Advanced Measurement & Analysis Grp., Inc*., a manufacturer of ultrasonic flow

meters for nuclear power plants sued competitors who misstated the accuracy of their own

meters to customers and potential customers.  515 F. Supp. 2d 565, 571 (W.D. Pa. 2007).  In

denying defendants' motion to dismiss, the court clearly stated that the question before it was

whether defendants "misrepresented the accuracy of [defendants' product] and disparaged

Plaintiff's device so as to violate the . . . Sherman Act[]."  *Id.* at 573-74.[9]   Like the defendants in

---

[9] Courts across the nation similarly hold that deception may be an anticompetitive, exclusionary act
in violation of the Sherman Act.  *See, e.g.*, *United States v. Microsoft Corp.*, 253 F.3d 34, 76-77 (D.C.
Cir. 2001) (holding Microsoft's campaign to deceive developers constituted exclusionary conduct in
violation of § 2 of the Sherman Act); *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d
1080, 1087 (D.C.Cir. 1998) (reversing in part the district court's dismissal of a complaint and holding that
radio station's claim that defendants misrepresented the reach of their broadcasting network to advertisers
and the government in order to protect its monopoly stated § 2 claim); *Int'l Travel Arrangers, Inc. v. W.*
*(continued)*

*Caldon*, Merck knew that its product did not live up to its expectations, but it took great efforts to conceal this information from the public to preserve and maintain its monopoly.  (CAC ¶¶ 83-85, 100, 107).

Government competition authorities are also increasingly concerned about the anticompetitive effects of deception.  In December 2009, the U.S. Federal Trade Commission ("FTC") alleged that Intel maintained its dominance in the worldwide microprocessor markets by, among other things, engaging in a decade-long campaign of deceit that included misrepresenting industry benchmarks to favorably reflect the performance of its central processing units relative to competitors' products.[10]   Specifically, the benchmarks Intel publicized "were not accurate or realistic measure of typical computer usage or performance." *Intel Complaint*, ¶¶ 65-66.  The FTC explained that "Intel's conduct was misleading and had the purpose and effect of harming competition and thus enhancing Intel's monopoly power."  *Id.* ¶

---

*(continued)*

*Airlines, Inc.*, 623 F.2d 1255 (8th Cir. 1980) (upholding treble damages antitrust award against airline with monopoly power after finding sufficient evidence that airline placed false, deceptive and misleading advertisements discouraging public patronage of travel group charters); *Research in Motion Ltd. v. Motorola, Inc.*, 644 F. Supp. 2d 788 (N.D. Tex. 2008) (denying defendant's motion to dismiss and holding defendant's alleged misrepresentation to SSO that it would license standard essential patented technology on FRAND terms constituted anticompetitive conduct); *Davis v. S. Bell Tel. & Tel. Co.*, No. 89-2839-CIV-NESBIT, 1994 WL 912242, at *2, *7, *15 (S.D. Fla. 1994) (denying summary judgment on allegations of deception to maintain monopoly); *Brownlee v. Applied Biosystems, Inc.*, No. C-88-20672-RPA, 1989 WL 53864, at *5-6 (N.D. Cal. Jan. 9, 1989) (denying motion to dismiss complaint alleging defendants' deceit to potential customers as anticompetitive conduct).

[10]   *See* Complaint at 3, 10-11, *In re Intel Corp.*, No. 9341 (Dec. 6, 2009), *available at* http://www.ftc.gov/os/adjpro/d9341/091216intelcmpt.pdf (hereinafter *Intel Complaint*).  The *Intel Complaint* followed the European Commission imposing a $1.06 billion fine, Intel's $1.25 billion antitrust settlement with a competitor and the State of New York's antitrust complaint.  *See* Summary of European Commission Decision of 13 May 2009 Relating to a Proceeding Under Article 82 of the EC Treaty and Article 54 of the EEA Agreement at 13, 17, 2009 O.J. (C 227), *available at* http://eur-lex.europa.u/LexUriServ/LesUri/Serv.do?uri=OJ:c:2009:227:0013:0017:EN:PDF);  Arik Hesseldahl, *The Intel-AMD Settlement:  A Play-by-Play*, BUS. WK., Nov. 15, 2009, *available at* http://www.businessweek.com/technology/content/nov2009/tc20091115_692400.htm; Complaint at 78, *New York v. Intel Corp.*, No. 09-00827-JJF (D. Del. Nov. 4, 2009), *available at* http://www.ag.ny.gov/sites/default/files/pdfs/bureaus/antitrust/Intel_COMPLAINT.pdf.

71. Intel ultimately entered into a consent decree with the FTC in which it agreed to refrain from engaging in deception.[11]  Merck's argument that deception is not recognized as a form of exclusionary conduct is belied by clear precedent in this Circuit and elsewhere condemning the market effects of deceptive behavior as a violation of the antitrust laws.

Merck also attempts to argue that each of its acts, taken in isolation, do not amount to unlawful, exclusionary conduct.  To the contrary, when determining antitrust liability based on a collection of factual allegations, "the courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation." *LePage's,* 324 F.3d at 162 (citing *Cont'l Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699 (1962)); *see also City of Anaheim v. S. Cal. Edison Co.,* 955 F.2d 1373, 1376 (9th Cir.1992) ("[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect. . . . We are dealing with what has been called the 'synergistic effect' of the mixture of the elements.").  Thus, it is not only Merck's decade-long campaign of deception, but also its anticompetitive acts to cover up that deception, which include destroying evidence, lying to an FDA official, offering to buy employees' silence, and threatening an employee that wished to disclose the fraud, which should be considered in determining whether Merck unlawfully maintained its monopoly.  (*See* CAC ¶¶ 10, 62, 67-69, 71-75.)

While Merck relies on *West Penn Allegheny Health System, Inc. v. UPMC*, 627 F.3d 85 (3d Cir. 2010) (MTD at 13) to argue that false statements are only pertinent to an antitrust claim if they disparage a rival, nowhere in the decision does the Court make this sweeping pronouncement.  In *West Penn*, Pittsburgh's second-largest hospital system sued the city's

---

[11] Decision and Order at 13-17, *Intel Corp.*, No. 9341 (Aug. 4, 2010), *available at* http://www.ftc.gov/os/adjpro/d9341/100804inteldo.pdf.

dominant hospital system, UPMC, alleging, among other things, that UPMC attempted to monopolize the market for specialized hospital services. *See id.* In upholding West Penn's claim, the court concluded that UPMC had engaged in anticompetitive conduct including predatory hiring, coercing providers not to refer patients to West Penn and making false statements about West Penn. *See id.* at 109-10. As such, *West Penn* stands simply for the proposition that anticompetitive conduct comes in many forms, including disparagement.[12]

Merck's reliance on *Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123 (3d Cir. 2005) (MTD at 11) is similarly unavailing because its analysis is limited to deception in the context of a Section 1 claim. Moreover, *Santana* was expressly criticized by the Third Circuit in *West Penn* as "perhaps [] overly broad" in its assertion that "deception, reprehensible as it is, can be of no consequence so far as the Sherman Act is concerned." *West Penn*, 627 F.3d at 109 n.14 (quoting *Santana*, 401 F.3d at 132). More importantly, the facts alleged in this action are fundamentally at odds with those at issue in *West Penn* and *Santana* because here there is no rival for Merck to disparage, as Merck's deception created insurmountable barriers to entry and led to complete market foreclosure. In essence, Merck is advocating a definition of anticompetitive deception so narrow that it exempts the most effective exclusionary conduct of all.

*Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518 (5th Cir. 1999) (MTD at 12), also does not salvage Merck's argument because it is factually different from the allegations in this action. *Stearns*, an action involving competitors bidding on contracts to provide airline

---

[12] Nor, as Merck argues, does this case parallel *Schachar v. Am. Academy of Opthalmology, Inc.*, 870 F.2d 397 (7th Cir. 1989). (MTD at 14). *Schachar* was not, as Merck claims, a Section 2 case, but a Section 1 case about a trade association's ability to publicize its opinion that a procedure was experimental.

boarding bridges to municipal airports, itself lays out the fundamental difference between those

cases and this action.  As Merck noted, the *Stearns* court proclaimed "that there could be no

exclusion as long as the decision on the choice of supplier remained 'in the hands of the

consumer' and rivals were free to promote their own goods."  (MTD at 12 (quoting *Stearns*, 170

F.3d at 524)).  The Fifth Circuit went on to acknowledge:

> Bribery and threats are not competition on the merits.  Several
> cases have found violations of section 2 when a monopolist
> engages in what appears to be normal competitive behavior, but
> has manipulated representatives of the consumer to the point that
> the integrity of the decisional process has been violated.

*Id*. at 526.  Here, the decision on the choice of supplier was *never* in the hands of Plaintiffs

because Merck's conduct foreclosed all rivals.  While Merck's bribes and threats were aimed at

its employees, they were intended to prevent the public and would-be rivals from discovering

information that would have removed the unlawfully created barriers to entry and resulted in the

emergence of a more competitive market.  There is no question that Merck's enforcement of its

Mumps Vaccine license created barriers to entry and lessened competition in the market.  Indeed,

there was *no* competition in the market.

The fact that other vaccine manufacturers may *now* be attempting to enter the U.S.

Mumps Vaccine Market does not, as Merck argues, demonstrate that its misrepresentations and

omissions had nothing to do with competitors' decisions not to enter the market.  (MTD at 14 n.

10).  If anything, these current attempts at entry show that Merck's deceit was effective.  It was

only after the recent mumps outbreaks revealed that the vaccine was not as effective as Merck

fraudulently proclaimed, that other manufacturers applied for FDA approval.  Consequently,

Plaintiffs and Class Members never had *any* choice among rival suppliers, which *Stearns* makes

clear is necessary to defeat a claim of deception as an exclusionary act in violation of the antitrust laws.[13]

**B.**     **Plaintiffs Have Identified Sufficient Antitrust Injury Proximately Caused By Merck And, As Direct Purchasers, Have Standing To Bring Their Antitrust Claims.**

**1.**     **Plaintiffs Have Identified Sufficient Antitrust Injury Proximately Caused By Merck.**

Merck's misrepresentations (and omissions) about the efficacy of its vaccine created barriers to entry by discouraging competitors from entering the market because "it would be economically irrational for a potential competitor to bring a new Mumps Vaccine to the Relevant Market unless it thought it could compete with the safety and efficacy of the existing vaccine." (CAC ¶ 31). Without competition, Merck has been able to "increase[] the prices it charge[s] private health care providers, such as Plaintiffs, for M-M-R®II vaccine by an astounding 85%." (CAC ¶ 125). These artificially inflated prices were the direct and inevitable effect of Merck's anticompetitive, exclusionary conduct to maintain and further its monopoly in the relevant market. Plaintiffs suffered antitrust injury when they paid these artificially inflated prices to purchase the Mumps Vaccine. (CAC ¶ 11).

Merck attempts to distort Plaintiffs' well-pleaded allegations by arguing that their antitrust theory relies on speculation that other companies would have gained FDA approval and entered the U.S. Market if Merck had not misrepresented and concealed the diminished efficacy

---

[13] The same reasoning applies with respect to Merck's selective quotes from *Sanderson v. Culligan Int'l Co.*, 415 F.3d 620 (7th Cir. 2005) and *Oce North America, Inc. v. MCS Servs, Inc.*, 795 F. Supp. 2d 337 (D. Md. 2011) (MTD at 9-10). In both cases the courts stated that "[f]alse statements about a rival's goods do not curtail output in either the short or long run. They just set the stage for competition in a different venue: the advertising market." *Sanderson*, 415 F.3d at 623, *Oce,* 795 F. Supp. 2d at 345 (quoting *Sanderson*). Here, there could be no competition in the U.S. Market because Merck's deception before the FDA allowed it to illegally gain a competitive edge – only furthered by its dissemination of misleading materials to the public – that prevented other manufacturers from entering the market at all.

of its Mumps Vaccine.  (MTD at 16-17).  Merck's incorrect interpretation of proximate causation in antitrust cases is squarely refuted by the Third Circuit as well as other federal courts around the country.  As explained by the unanimous D.C. Circuit sitting *en banc* in *United States v. Microsoft Corp.*, "neither plaintiffs nor the court can confidently reconstruct a product's hypothetical technological development in a world absent the defendant's exclusionary conduct." 253 F.3d 34, 79 (D.C. Cir. 2001).  To "require that § 2 liability turn on a plaintiff's ability or inability to reconstruct the hypothetical marketplace absent a defendant's anticompetitive conduct would only encourage monopolists to take more and earlier anticompetitive action."  *Id.* Rather, an antitrust plaintiff need only show "the type of conduct that is reasonably capable of contributing significantly to a defendant's continued monopoly power."  *Id.*; *see also* 2 Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 338a at 317 (2000) ("[T]o require proof that the illegal conduct was the *exclusive* cause of the plaintiff's injury would effectively deny private remedies, because multiple causes always affect everyone.").  As such, the critical question is not what the market *would have* looked like but for defendant's anticompetitive conduct, but rather, what it *could have* looked like.  *See Microsoft*, 253 F.3d at 79.

The Third Circuit echoed the *Microsoft* Court's articulation of proximate causation in *Broadcom*.  In reversing the dismissal of Broadcom's monopolization claim against Qualcomm, a competitor patent-holder who harmed competition by foreclosing rivals from having their technology adopted by an SSO, the Third Circuit noted the lower court's failure to consider that the SSO "*might have* chosen nonproprietary technologies for inclusion in the standard."  501 F.3d at 305 (emphasis added).  The Third Circuit explained that it was reasonable to infer the SSO selected Qualcomm's technology to the detriment of patent-holders competing to have their technology incorporated in the standard particularly because "even if [defendant's] technology

was the only candidate for inclusion in the standard," the SSO would have rejected it absent

Qualcomm's promise to license the technology on fair, reasonable and non-discriminatory terms.

*Id*. at 316.  "Thus, the allegations of the Complaint foreclose[d] the possibility" that the inclusion

of Qualcomm's technology in the standard "was inevitable."  *Id.*

　　Similarly, in *In re Wellbutrin SR/Zyban Antitrust Litig.*, Judge Kauffman considered

whether a valid antitrust claim could be stated where defendants argued that, regardless of any

frivolous patent infringement litigation, the generic companies failed to secure FDA approval.

281 F. Supp. 2d 751 (E.D. Pa. 2003).  In denying defendants' motion to dismiss, the court found

"[d]efendants' ability to pose a plausible and legally permissible version of events that explains

why generic manufacturers of Wellbutrin SR have not yet entered the market" did not compel it

to grant their motion, because on "a motion to dismiss, the Court must draw all reasonable

inferences in favor of Plaintiffs."  *Id.* at 757.[14]  Judge Kauffman reasoned that it could be

inferred that the "burdensome patent litigation" directed the generic companies' resources away

from FDA approval, and that this reallocation of funds resulted in a delay of FDA approval.  *Id.*

　　Here, as in *Microsoft*, *Broadcom* and *Wellbutrin*, Plaintiffs allege that other competitors

*could have* attempted to license and sell their Mumps Vaccine in the U.S. Market but for

Merck's anticompetitive and exclusionary acts.  Or that, if the U.S. government knew the true

efficacy of Defendant's Mumps Vaccine it "might not have approved the vaccine at all for sale in

---

[14] *See also In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 651-52 (E.D. Mich. 2000)
(holding but-for causation is not eliminated "simply because the defendant can conjure up a set of facts,
contradicting those alleged in the plaintiff's complaint, but supporting an alternative possible cause for
Plaintiffs' injuries that would not offend the antitrust laws."); *Va. Vermiculite, Ltd. v. WR Grace & Co.*,
156 F.3d 535, 540 (4th Cir. 1998) (reversing Rule 12(b)(6) dismissal and holding that defendant was
"foreclosed from challenging causation simply on the basis that it could have achieved the same result
through lawful means.").

the U.S." (CAC ¶¶ 113, 123, 137).  As in *Broadcom*, the allegations of the Complaint

demonstrate that Merck's position as the exclusive provider of Mumps Vaccine in the U.S.

Market was not *inevitable*.  This is more than sufficient because "Plaintiffs need not 'allege (or

dispose of) all alternative theories of causation to survive a motion to dismiss.'"  *In re Neurontin

Antitrust Litig.*, MDL No. 1479, 2009 WL 2751029, at *12 (D.N.J. Aug. 28, 2009) (quoting *In re

K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 535 (D.N.J. 2004)).

      It is more than reasonable to infer that, if competitors had known that Merck's Mumps

Vaccine efficacy had degraded over time, they would have attempted to enter the U.S. Market.

This inference is further underscored by the admission of one of Merck's own employees, who

explained that Merck falsified test data to misrepresent the efficacy of its Mumps Vaccine as a

"business decision" (CAC ¶ 70).  In other words, had Merck not lied about the efficacy of its

vaccine, others would have entered the U.S. Market and Merck would have lost business.

Further, as Merck itself admits, in the wake of the historic and unprecedented mumps outbreaks

in 2006 and 2009, new manufacturers are now applying for, and the U.S. government is now

funding, the development of a new mumps vaccine.[15]  Because Plaintiffs have set forth facts

consistent with their allegations – that competitors were foreclosed from entering the market –

and on a motion to dismiss "the question is whether the claimant can prove any set of facts

consistent with his or her allegations that will entitle him or her to relief, not whether that person

will ultimately prevail," Merck's alternate theory of the case is irrelevant at this stage of the

---

[15] *See supra* page 16 (discussing other vaccine manufacturers' recent attempts to enter the market).

litigation.  *Tender Touch Rehab Servs., LLC v. Brighten at Bryn Mawr*, No. Civ.A 11-7016, 2012

WL 993532, at *3 (E.D. Pa. Mar. 23, 2012).[16]

Moreover, Merck's argument that to allege antitrust injury, Plaintiffs must demonstrate

that the FDA would have approved potential competitors' vaccines for licensing (MTD at 18), is

belied by applicable case law.  Where manufacturers of generic products allege antitrust injury in

the form of sham litigation or fraud in the procurement of a patent by the brand-name defendant,

"[s]everal courts have held that a finding of antitrust injury cannot be tied to the status of FDA

approval."  *Neurontin*, 2009 WL 2751029, at *12.[17]

### 2.      As Direct Purchasers, Plaintiffs Have Standing To Bring Their Antitrust Claims.

Because Plaintiffs purchased Mumps Vaccine directly from Merck, they are the proper,

indeed the only, parties in the chain of distribution with standing to bring these federal antitrust

claims.  (CAC ¶¶ 12-14).   Merck's argument that Plaintiffs likely suffered no damages because

they may be reimbursed for vaccines they administer to patients is an impermissible pass-on

defense that has been repeatedly rejected under federal case-law.  (MTD at 5 n.1, 25 n.16)   In

*Illinois Brick Co. v. Illinois*, the Supreme Court clearly held that *only* the harmed direct

purchaser in the distribution chain "is the party 'injured in his business or property' within the

---

[16] The pleading standard on a motion to dismiss requires the court to "accept the truth of all factual allegations in the complaint and must draw all reasonable inferences in favor of the [plaintiff]." *Revell v. Port Auth.*, 598 F.3d 128, 134 (3d Cir. 2010).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).

[17] *See also Bristol-Myers Squibb Co. v. Ben Venue Labs.*, 90 F. Supp. 2d 540, 544-46 (D.N.J. 2000) (accepting the counterclaimants' contention that they need not demonstrate FDA approval to invoke antitrust standing); *Abbott Labs. v. Mylan Pharm.*, No. 05-6561, 2007 WL 625496, at *4 n. 2 (N.D. Ill. Feb. 23, 2007) (observing that basing antitrust injury on "the status of FDA approval relative to the required timing of the suit" would render such injury "wholly contingent on the vagaries of timing of agency action.") (internal quotation marks and citation omitted).

meaning" of the Clayton Act.  431 U.S. 720, 729 (1977).[18]  Because Plaintiffs are the first party

in the distribution chain to be subject to and harmed by Merck's anticompetitive monopolization

scheme, they are the *only* parties with standing to bring federal antitrust claims for damages.

### III.    The Federal Food, Drug and Cosmetic Act ("FDCA") Does Not Preempt Plaintiffs' Federal Antitrust And State Law Claims.

Merck's decade-long campaign of deceit to maintain its monopoly in the U.S. Market for

Mumps Vaccine involved not only misrepresentations and omissions made to the FDA, and on

product inserts, but false statements in publicly disseminated promotional and marketing

materials.  (CAC ¶¶ 84-110).  Merck misconstrues outdated Supreme Court precedent to argue

that, because Plaintiffs' claims incorporate allegations that Merck misrepresented the true

efficacy of its Mumps Vaccine to the FDA and on the vaccine's label, their claims are

preempted.  What Merck fails to acknowledge is that its misrepresentations and omissions to the

FDA and on product labeling are only part of an overall scheme of deception that harmed health

care providers like Plaintiffs, who paid inflated prices for Mumps Vaccines of questionable

efficacy.

Merck's failure to comply with its duties of disclosure under the FDCA, while relevant to

show how Merck was able to maintain its total monopoly on the Mumps Vaccine market, does

not turn this private civil litigation into an FDCA case.  As the Supreme Court expressly held in

---

[18] *See also Gulfstream III Assocs. Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 439 (3d Cir. 1993) (holding only the direct purchaser of an aircraft, and not a downstream buyer or assignee, has standing to pursue an antitrust claim); *Link v. Mercedes-Benz of N. Am.*, 788 F.2d 918, 930-31 (3d Cir. 1986) (because appellants did not purchase directly from Mercedes, *Illinois Brick* barred their claims); *Merican, Inc. v. Caterpillar Tractor Co.*, 713 F.2d 958, 966-69 (3d Cir. 1983) (finding indirect purchaser, even if a 'direct target' of an antitrust conspiracy, lacked standing under *Illinois Brick*).  These policies accord with the Supreme Court's acknowledgement that the direct-purchaser rule denies "recovery to those indirect purchasers who may have been actually injured by antitrust violations."  *Illinois Brick*, 431 U.S. at 746.

*Wyeth v. Levin*, "Congress did not intend FDA oversight to be the exclusive means of ensuring drug safety and effectiveness."  555 U.S. 555, 575 (2009).[19]  In that case, the Court held that allegations of product mislabeling can support private claims even if a defendant did not violate FDCA labeling requirements because the FDA's requirements merely establish a "floor" that manufacturers must not fall below.  *Id.* at 577.[20]  Wyeth's even "more fundamental misunderstanding" was the belief that the FDA, rather than the manufacturer, bears primary responsibility for drug labeling.  *Id.* at 570.  "[The manufacturer] is charged both with crafting an adequate label and with ensuring that its warnings remain adequate as long as the drug is on the market."  *Id.* at 570-71.  Consequently, even if Merck's label satisfied its obligations to the FDA, which Plaintiffs contend it did not, that is independent of the question of whether the label constitutes an anticompetitive act of deceit actionable under the Sherman Act and state laws.

While *Wyeth* involved state law claims, the same logic has been applied to the federal antitrust laws.  Numerous cases hold that where defendants violate the Sherman Act through anticompetitive conduct, including fraud on a government agency, they cannot evade antitrust scrutiny.  For example, in *Israel v. Baxter Labs., Inc.*, where plaintiff drug manufacturers alleged that certain competitors conspired to prevent their new drug from being approved by the FDA

---

[19] In fact, Merck itself acknowledged the FDA's less than omnipotent role in a recent *amicus* brief: "HHS plays an active role in the research, development, and ongoing monitoring and evaluation of the safety of vaccines, even apart from the [FDA's] rigorous licensing process."  *See* Brief of Merck, et al., as *Amici Curiae* Supporting Respondents, *Bruesewitz v. Wyeth, Inc.*, No. 09-152, 2010 WL 3048323, at *5 (July 30, 2010).

[20] *Wyeth* only emphasizes the absurdity of Merck's argument that Plaintiffs' state law claims are preempted by federal law because it would be impossible for Merck to label the vaccine accurately while complying with its FDA obligation to use approved labeling.  (MTD p. 20).  In *Wyeth*, the Supreme Court held that "absent clear evidence that the FDA would not have approved a change to [Defendant's] label, we will not conclude that it was impossible for Wyeth to comply with both federal and state requirements."  555 U.S. at 572.  Such "clear evidence" is not present here.  Moreover, Merck has a continuous and concomitant duty to the FDA to ensure that the contents of its vaccine labels are accurate and up-to-date (Relators' Opposition at 10).  *See* note 8, *supra*.

by, among other things, "misrepresenting the safety and efficacy of [plaintiffs' product]," the

D.C. Circuit expressly preserved plaintiffs' right to prove their antitrust claims.  466 F.2d 272,

274 (D.C. Cir. 1972).  The Court found that plaintiffs alleged that "the real purpose of

defendants' joint efforts [before the FDA was] to preclude, not induce fair FDA consideration"

of plaintiffs' product.  *Id.* at 279.  "No actions which impair the fair and impartial functioning of

an administrative agency should be able to hide behind the cloak of an antitrust exemption."  *Id.*

at 278-79.[21]

Merck's reliance on the Supreme Court's holding in *Buckman Co v. Plaintiffs' Legal*

*Committee* (MTD at 16, 20) is unpersuasive, not only in light of *Wyeth*, but because *Buckman*

rebuffed a decidedly non-traditional tort cause of action.  531 U.S. 341 (2001).  In *Buckman*, the

Court considered whether a person injured by an FDA-approved medical device could recover

from a contractor involved in securing federal approval by showing that the consultant had

deceived the agency.  In holding the cause of action preempted by the FDCA, *Buckman*

emphasized that ordinary preemption principles were inoperative because, unlike claims based

"on traditional state tort law principles," *id.* at 352, and implicating "federalism concerns and the

historic primacy of state regulation of matters of health and safety," *id.* at 348 (quotation marks

and citation omitted), "[p]olicing fraud against federal agencies is hardly 'a field in which the

---

[21] *See also Clipper Exxpress*, 690 F.2d at 1261 ("the fraudulent furnishing of false information to an agency in connection with an adjudicatory proceeding can be the basis for antitrust liability, if the requisite predatory intent is present and the other elements of an antitrust claim are proven."); *Woods Exploration & Producing Co. v. Aluminum Co. of Am.*, 438 F.2d 1286, 1297 (5th Cir. 1977) (summary judgment reversed where oil producers allegedly conspired to report false production data to state agency in order to increase production allowance; regulatory scheme did not sanction defendants' alleged conduct); *Warner-Lambert Co. v. Purepac Pharm. Co.*, No. 99-5948, 2000 WL 34213890 (D.N.J. Dec. 22, 2000) (holding that fraudulent listing in Orange Book is subject to *Walker Process* exception to *Noerr-Pennington* immunity); *Abbott Labs. v. Alra Lab., Inc.*, No. 92 C 5806, 1993 WL 293995 (N.D. Ill. Aug. 4, 1993) (allowing claim of fraud based on allegation that party knowingly filed false listing with the FDA concerning coverage of a patent).

States have traditionally occupied,'" *id.* at 347 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). Whereas the duties sued upon in earlier preemption cases were independent of federal statutes, the novel cause of action in *Buckman* owed its "existence" to the FDCA. *Id.* at 353.[22]  As the court in *In re DDAVP Indirect Purchaser Antitrust Litigation* explained in holding that plaintiffs' state-law antitrust and consumer protection claims based in defendants' sham citizen petition before the FDA were not preempted in light of *Buckman*:

> [Plaintiffs'] claims make freestanding allegations of wrongdoing apart from the defendant's purported failure to comply with FDA disclosure requirements, i.e., anticompetitive conduct designed to maintain a fraudulent monopoly through a knowingly invalid patent – sufficient for these claims not to be preempted.  Further, proof of fraud on the FDA is not an element of an antitrust claim. It may be *evidence* of such a claim . . . but it is not an affirmative element that Plaintiffs are required to prove to make out an antitrust claim.

No. 05-cv-2237, 2012 WL 4932158, at *15 (S.D.N.Y. Oct. 17, 2012) (citations and quotation marks omitted).

---

[22] S*ee also Lfaivre v. KV Pharmaceutical Co.*, 636 F.3d 935 (8th Cir. 2011) (FDA's regulatory scheme related to prescription medications did not preempt consumer's putative class action against manufacturer of hypertension medication, alleging breach of implied warranty); *In re Bayer Corp. Combination Aspirin Prods. Marketing and Sales Practice Litig.*, 701 F. Supp. 2d 356 (E.D.N.Y. 2010) (buyers' putative class actions alleging state law false advertising and consumer protection claims against pharmaceutical manufacturer for deceptive advertising including false claims to consumers that FDA had approved defendant's products not preempted by FDCA); *Prohias v. Pfizer, Inc.*, 490 F. Supp. 2d 1228 (S.D. Fla. 2007) (FDA's approval of label for cholesterol-lowering drug did not preempt patients' state law false advertising claims); *Brasher v. Sandoz Pharms. Corp.*, Nos. CV-98-TP-2648-S, CV-98-TMP2650-S, 2001 WL 36403362, at *7 (N.D. Ala. Sept. 21, 2001) (finding *Buckman* did not preempt plaintiff's misrepresentation claims because "[t]here is nothing in *Buckman* to suggest that the plaintiffs in that case alleged other grounds for relief, such as fraud on the medical community . . . ."); *cf. Dawson ex rel. Thompson v. Ciba-Gelgy Corp., USA*, 145 F. Supp. 2d 565, 573 (D.N.J. 2001) (where plaintiffs brought class action on behalf of Ritalin users against manufacturer for fraud, misrepresentation and breach of warranties, holding *Buckman* did not create federal question jurisdiction because complaint did not allege a claim of fraud-on-the-FDA, but rather alleged defendants deceived the public, including plaintiffs).

For these reasons, and as further elucidated in the Relators' Opposition, which is incorporated by reference here (*see* note 8, *supra*), the private claims raised in this action in no way preempt the FDCA and, if anything, complement the goals and purpose of the FDA vaccine licensing process.

## IV. Plaintiffs Have Standing To Sue Under The Consumer Protection Statutes Of Their Own States And Their Standing To Sue Under The Consumer Protection Statutes Of States Other Than Their Own Should Be Deferred Until Class Certification Proceedings.

In the Second Claim for Relief, Plaintiffs assert claims against Merck for violations of the consumer protection laws of 24 states.[23]  In its motion to dismiss, Merck contends that Plaintiffs, who reside in Alabama, New York and New Jersey, lack standing to assert claims "based on consumer protection statutes of states other than their own."  (MTD at 22).  As set forth below, Merck's Article III challenge to Plaintiffs' standing to sue is without merit.  Moreover, Merck's challenge to Plaintiffs' standing to sue under the laws of states other than Alabama, New York and New Jersey is premature, and this Court's determination of those issues should be deferred until Rule 23 class certification proceedings.

There is no doubt that Plaintiffs have alleged facts plausibly demonstrating injury-in-fact sufficient to confer Article III standing to bring consumer protection claims under the laws of New York and New Jersey.  The Complaint alleges that Plaintiffs purchased Mumps Vaccine with questionable efficacy, at artificially inflated prices.  (CAC ¶¶ 11-14, 37, 124-27, 133 and 155).  That is, Plaintiffs personally purchased Mumps Vaccine at artificially inflated prices – a

---

[23]   On behalf of themselves and the members of the State Consumer Protection Subclass, Plaintiffs assert claims for violations of the consumer protection statutes of the following states:  Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Idaho, Illinois, Kansas, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Dakota, Ohio, Oklahoma, Virginia and Washington.  (CAC ¶¶ 157, 158(a)-(y) (identifying state statutes)).

monetary injury – which constitutes actual harm.  *See, e.g., Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 293 (3d Cir. 2005); *In re Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d 867, 887 (E.D. Pa. 2012).  This injury can be redressed by the relief sought by Plaintiffs including, *inter alia*, monetary damages to compensate them for their financial harm.  Accordingly, Plaintiffs have Article III standing to assert consumer protection claims under the laws of New York and New Jersey.  *See id.* at 887-91.

Eschewing this straightforward analysis, Merck asks this Court to find that Plaintiffs lack standing to sue under the consumer protection statutes of the 22 remaining states.  (MTD at 22-23).  Tellingly, Merck fails to analyze the relevant provisions of each state's consumer protection statute to support its blanket assertion that each such statute requires a plaintiff to have in-state residency or to have made an in-state purchase.  In any event, Merck's standing arguments are premature and resolution of this issue should be deferred until class certification issues have been resolved.

In the class action context, named representative plaintiffs initially need only establish that they individually have standing to bring their claims.  "The initial inquiry …. is whether the lead plaintiff individually has standing, not whether or not other class members have standing." *Winer Family Trust v. Queen*, 503 F.3d 319, 325-26 (3d Cir. 2007).  "Once threshold individual standing by the class representative is met, a proper party to raise a particular issue is before the court, and there remains no further separate class standing requirement in the constitutional sense." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 306-07 (3d Cir. 1992) (quoting 1 NEWBERG ON CLASS ACTIONS § 2.05 (3d ed. 1992)).  As explained in a subsequent edition of that influential treatise:

> In a class action, those represented are, in the words of the Supreme Court, passive members of the class, in contrast to the named plaintiff who is actively prosecuting the litigation in their behalf.  These passive members need not make any individual showing of standing, because the standing issue focuses on whether the plaintiff is properly before the court, not whether represented parties or absent class members are properly before the court.  *Whether or not the named plaintiff who meets individual standing requirements may assert the rights of absent class members is neither a standing issue nor an Article III case or controversy issue but depends rather on meeting the prerequisites of Rule 23 governing class actions.*  The fact that the plaintiff now seeks to represent the rights of absent parties because the case or controversy is common to those parties does not in any way create additional constitutional standing requirements.

William B. Rubinstein et al., 1 NEWBERG ON CLASS ACTIONS § 2:7 (4th ed. 2008) (emphasis added and footnotes omitted).[24]

Courts generally address challenges to standing as a threshold matter; however, in class actions, the Supreme Court has crafted an exception to this general rule:  Courts may evaluate class certification issues *before* Article III standing concerns if the former are "logically antecedent" to the latter.  *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999) (quoting *Amchem Prods. v. Windsor*, 521 U.S. 591, 612 (1997)).  Neither the Supreme Court nor the Third Circuit has described the precise circumstances under which class certification logically takes precedence over standing.  However, district courts within this Circuit have considered this question on numerous occasions and concluded that:

---

[24]  "The reason that named plaintiffs in a proposed class action bring claims under consumer protection laws of states where they do not reside is that it allows them to preserve those claims in anticipation of eventually being joined by class members who do reside in the states for which claims have been asserted."  *Blessing v. Sirius XM Radio, Inc.*, 756 F. Supp. 2d 445, 452 (S.D.N.Y. 2010).  *See also Avenarius v. Eaton Corp.*, No. 11-09-SLR, 2012 WL 4903373, *3 n.5 (D. Del. Oct. 16, 2012).

> The *Ortiz* exception appears "to rest on the long-standing rule that, once a class is properly certified, statutory and Article III standing requirements must be assessed with reference to the class as a whole, not simply with reference to the individual named plaintiff." Accordingly, Rule 23 certification should be addressed first in those cases where it is the possibility of class certification that gives rise to the jurisdictional issue as to standing. Stated differently, the Ortiz exception treating class certification as the antecedent consideration does *not* apply if the standing issue would exist regardless of whether the named plaintiff filed his claim alone or as part of a class.

*Clark v. McDonald's Corp.*, 213 F.R.D. 198, 204 (D.N.J. 2003) (quoting *Payton v. County of Kane*, 308 F.3d 673, 680 (7th Cir. 2002) (other citation omitted)).  As interpreted in *Clark*, the Supreme Court's decision in *Ortiz* allows this Court to defer ruling on Article III standing issues where, as here, they are circumscribed by the act of certifying a class.[25]

Similarly reasoned decisions have been issued by district courts within the Second Circuit.  In the seminal case, *In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363 (S.D.N.Y. 2002), the defendant drug manufacturer argued that end-payor plaintiffs lacked standing to assert state law antitrust and unfair competition claims against the manufacturer on behalf of prescription drug purchasers nationwide because they only alleged to have purchased the drug in 15 states. Arguing that plaintiffs lacked standing to raise claims under the laws of the other states, the drug manufacturer asserted that this presented an Article III obstacle to the district court's jurisdiction over those state law claims.  *See id.* at 377.  Rejecting the drug manufacturer's argument, the

---

[25] Numerous decisions from the District of New Jersey have reached the same conclusion.  *See, e.g., In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 544 (D.N.J. 2004) ("This Court will not address this Article III standing issue prior to determining class certification."); *In re Hypodermic Prods. Antitrust Litig.,* No.05-CV-1602, 2007 WL 1959225, at *15 (D.N.J. June 29, 2007) (rejecting defendant's argument that state law claims should be dismissed because "the named plaintiffs lack standing to bring claims in those states in which the named plaintiffs do not reside or engage in business" because "in accordance with *Ortiz*, the Court will defer its consideration of this argument until after class certification issues have been resolved") (citations omitted).

court stated that "these alleged problems of standing will not arise unless class certification is granted." *Id.* It explained:

> If certification is granted, the proposed class would contain plaintiffs who have personal standing to raise claims under the laws governing purchases in all of the fifty states, and the only relevant question about the named plaintiffs' standing to represent them will be whether the named plaintiffs meet the ordinary criteria for class standing, including whether their claims are typical of those of the class, whether they will adequately represent the interests of the class, and whether there are common legal and/or factual issues that predominate over any differences among the classmembers [sic]. . . .
>
> In any event, this challenge is premature. The parties have not yet briefed the choice of law question, which will determine what state laws govern the claims of the various putative class members whom the End-Payors seek to represent. Hence, the Court cannot yet determine what differences, if any, there are in the legal standards that will apply to the different plaintiffs' claims nationwide.

*Id.* Numerous district courts within the Second Circuit have followed the reasoning of *Buspirone,* finding that class certification is logically antecedent to standing and, therefore, deferred consideration of standing issues until after class certification issues have been resolved.[26]

The above-referenced precedents from the District of New Jersey and the Southern District of New York were reviewed and, ultimately, followed in *In re Chocolate Antitrust Litig.*,

---

[26] *See, e.g.*, *In re Grand Theft Auto Video Game Consumer Litig.,* No. 06 MD 1739(SWK)(MHD), 2006 WL 3039993, at *2-3  (S.D.N.Y. Oct. 25, 2006); *In re DDAVP Indirect Purchaser Antitrust Litig.*, 2012 WL 4932158 at *8-9 (surveying case law before "join[ing] the courts in that growing consensus and find[ing] that class certification is logically antecedent to the issue of standing in this case"); *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 406 (S.D.N.Y. 2011); *Blessing v. Sirius XM Radio, Inc.*, 756 at 451 ("While the Second Circuit has not directly addressed the issue, there has been a growing consensus among district courts that class certification is 'logically antecedent,' where its outcome will affect the Article III standing determination, and the weight of authority holds that in general class certification should come first.").

602 F. Supp. 2d 538 (M.D. Pa. 2009), an antitrust case wherein plaintiffs representing indirect

end users and indirect purchasers for resale collectively advanced claims arising under the

antitrust and consumer protection statutes of 25 states and the District of Columbia.  *See id.* at

578.  Defendants sought dismissal of plaintiffs' claims under the state laws in which no putative

class representative either resided or did business, contending that the named plaintiffs lacked

Article III standing to assert such state law claims.  The court determined that defendants'

challenge to the named plaintiffs' standing was premature:

> In the instant matter, the plaintiffs' capacity to represent
> individuals from other states depends upon obtaining class
> certification, and the standing issue would not exist but for their
> assertion of state law antitrust claims on behalf of class members
> in these states.  Therefore, the standing issues arise from the
> plaintiffs' attempts to represent the proposed class.  These class
> certification issues are "logically antecedent" to the standing
> concerns, and the court will defer ruling on the latter until class
> certification proceedings.

*Id.* at 579-80 (citations omitted).  *Accord Avenarius*, 2012 WL 4903373 at *3 (rejecting

defendants' contention that plaintiffs lacked standing because they "do not reside in or claim to

have brought trucks in twenty of the states in which they make claims").

Ignoring this nearly unbroken line of precedent, Merck relies on *In re Wellbutrin XL

Antitrust Litig.*, 260 F.R.D. 143 (E.D. Pa. 2009). (MTD at 22).  In that case, the court found that

plaintiffs, who were located in Alabama, Illinois, Tennessee and Ohio, "have standing to assert

claims only under the laws of those states where the plaintiffs are located."  *Id.* at 149; *see also*

*id.* at 157-58.  Rejecting the weight of authority – including the above-referenced district court

decisions in *Buspirone*, *Clark*, *Hypodermic*, *K-Dur*, *Sheet Metal* and *Chocolate Confectionary* –

the court based its conclusion on purported burdens of discovery.  *See id*. at 155.  Plaintiffs

respectfully submit that *Wellbutrin* should not be followed in this case because it is contrary to

the great weight of persuasive authority within this Circuit (and within others).  Moreover,

Merck cannot demonstrate, and it cannot be found, that the burdens of class certification-related discovery would be any greater if the issue of Plaintiffs' standing to sue under the 23 above-referenced state laws is deferred until Rule 23 class certification proceedings.

**V.      Plaintiffs Klein And Sutter Have Sufficiently Alleged Consumer Protection Claims Under The Statutes Of Their Respective States**

      **A.      Plaintiff Klein Has Alleged A Viable Claim Under New York's Consumer Protection Statute, N.Y. Gen. Bus. Law § 349.**

Merck's argument (MTD at 23-26) that Plaintiff Klein has failed to state a claim under New York's consumer protection statute, N.Y. Gen. Bus. Law § 349 ("Section 349")[27] is meritless.  Merck argues that Plaintiff Klein has not alleged "consumer-oriented conduct" on the part of Merck, and has not alleged injury to the public interest.  (MTD at 24-25).  Merck is wrong on both counts.

Whether a defendant's conduct is consumer-oriented is to be "construed liberally." *New York v. Feldman*, 210 F. Supp. 2d 294, 301 (S.D.N.Y. 2002); *see also Marini v. Adamo*, 812 F. Supp. 2d 243, 272 (E.D.N.Y. 2011).  New York courts describe "consumer-oriented conduct" as that which is "aimed at the public at large." *Oshy v. Koufa Realty Corp.*, 951 N.Y.S. 2d 87, at *5 (N.Y. Sup. Ct. 2012).  This is to be distinguished from private disputes, such as between a landlord and tenant.  *See id.*; *see also Lawlor v. Cablevision Sys. Corp.*, 839 N.Y.S. 2d 433, at *3 (N.Y. Sup. Ct. 2007) ("An act or practice is consumer-oriented if it is aimed at the public

---

[27] Section 349 "prohibits 'deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service . . . .'" *Blue Cross and Blue Shield of New Jersey, Inc. v. Phillip Morris USA, Inc., et. al.*, 344 F.3d 211, 218 (2d Cir. 2003) (quoting N.Y. Gen. Bus. Law § 349(a)).  The statute is "intended to be broadly construed." *State by Lefkowitz v. Colorado State Christian College of Church of Inner Power, Inc.*, 346 N.Y.S.2d 482, 486 (N.Y. Sup. Ct. 1973) (internal quotation and citations omitted).  To properly state a claim under Section 349, "a plaintiff must allege that a defendant has engaged in: (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the deceptive act or practice." *City of New York v. Smokes-Spirits.com, Inc.*, 911 N.E.2d 834, 838 (N.Y. 2009).

generally."). Further, "[a] defendant engages in 'consumer-oriented' activity if his actions cause any 'consumer injury or harm to the public interest.'" *Feldman*, 210 F. Supp. 2d at 301 (quoting *Securitron Magnalock Corp v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995)). "[C]ourts have found sufficient allegations of injury to the public interest where plaintiffs plead repeated acts of deception directed at a broad group of individuals." *Id.* (citing *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 175 F. Supp. 2d 593, 631 (S.D.N.Y. 2001)).

Here, Plaintiff Klein repeatedly alleges that Merck misled the public and the U.S. government by representing a falsely inflated efficacy rate for its Mumps Vaccine when it knew that the vaccine had diminished in efficacy. (CAC ¶¶ 27, 83, 84, 102, 103). The Complaint also alleges that Merck submitted fraudulent test results to the FDA. (CAC ¶¶ 9, 10, 53, 64, 69, 71-80, 87-88, 93, 146, 152), the direct effect of which was to maintain FDA approval so that Merck could sell its Mumps Vaccine to the public. Such allegations constitute the requisite consumer-oriented conduct because the misrepresentations were directed to the public at large and resulted in the public paying for and being administered a vaccine that was nowhere nearly as effective as represented by Merck. (CAC ¶ 33). Likewise, this consumer-oriented conduct presented harm to the public interest in New York and throughout the United States because it left the public susceptible to mumps outbreaks, which have already occurred twice and continue to present a significant risk of resurgence. (CAC ¶¶ 95-110).[28]

---

[28] The cases cited by Merck (MTD pp. 23-26) are misplaced. First, *In re: Rezulin Prods. Liab. Litig.*, 390 F. Supp. 2d 319 (S.D.N.Y. 2005) is inapplicable at this stage of the litigation because the court in that case applied a motion for summary judgment standard in coming to its decision. Further, the alleged misrepresentations about Rezulin® were not made to the plaintiff health benefit providers or to their beneficiaries, (*i.e.*, the public), but, rather, to the plaintiffs' pharmacy benefit managers ("PBM") in an attempt to have the PBMs include the defendant's drug on their formularies. *See id.* at 328, 337. According to the court, the defendant "did not direct any marketing efforts at [plaintiffs] because it knew

*(continued)*

Merck's argument that Plaintiff Klein has not alleged injury to himself (MTD at 25) fairs no better. Plaintiff Klein and the Class Members were injured because they were forced to pay more for the Mumps Vaccine than they would have had the diminished efficacy of the vaccine been revealed. (CAC ¶¶ 11-14, 124-27, 133, 145, 155, 168-69, 175, 186, 191, 202, 204). Moreover, it is important to note that "antitrust violations . . . constitute the kind of deceptive acts and practices contemplated by Section 349." *Feldman*, 210 F. Supp. 2d at 302; *see also Cox v. Microsoft Corp.*, 8 A.D.3d 39, 40 (N.Y. App. Div. 2004) (finding that "purposeful, deceptive, monopolistic business practices" violate Section 349); *In re Auto Refinishing Paint Antitrust Litig.*, 515 F. Supp. 2d 544, 554-56 (E.D. Pa. 2007) (anticompetitive conduct comes within Section 349 when it is deceptive).

Merck's argument that Section 349 does not apply because Plaintiff Klein "failed to allege any deceptive acts or practices occurring within the state of New York," (MTD at 23), should be flat out rejected because Plaintiff Klein has alleged that he is a resident of New York, purchased the Mumps Vaccine from Merck in New York, and was injured by paying artificially inflated prices for the vaccine in New York. (CAC ¶ 13). Reliance on the case cited by Merck, *Weaver v. Chrysler Corp.*, 172 F.R.D. 96 (S.D.N.Y. 1997), is misplaced because the plaintiff in

---

*(continued)*

that they were clients of [the PBM], and that [the PBMs], not the [plaintiffs] themselves, administered their pharmacy benefits." *Id.* at 328. Here, by contrast, it is alleged that Merck's misrepresentations were made directly to Plaintiff Klein and the public. ( CAC ¶¶ 4, 27, 83, 84, 102, 103). Reliance on *Black Radio Network, Inc. v. Nynex Corp.*, 44 F. Supp. 2d 565 (S.D.N.Y.1999) is also misplaced. In that case the court dismissed a Section 349 claim because that case involved "businesses engaged in arm's length transactions for services that are not available to the general public." *Id.* at 583. The complaint also was "devoid of any reference to harm to the public at large." *Id.* Here, the Mumps Vaccine was manufactured and marketed by Merck for the public specifically, and, thus, Merck's misrepresentations about efficacy were made to the public. (CAC ¶¶ 27, 83, 84, 102, 103).

that case *was not* a New York resident, and *did not* purchase the defective product at issue in

New York, but nevertheless attempted to represent a class under Section 349.  *See id.* at 98.

Further, Plaintiffs may assert claims under Section 349 when defendant's actions affect

interstate commerce.  *See Two Queens, Inc. v. Scoza*, 745 N.Y.S.2d 517, 519 (N.Y. App. Div.

2002) ("It is by now well established that states can enact and enforce, through their courts,

legislation which affects interstate commerce 'when such commerce has significant local

consequences.'") (quoting *Leader Theatre Corp. v. Randforce Amusement Corp.*, 58 N.Y.S.2d

304, 307 (N.Y. Sup. Ct. 1945)); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,

536 F. Supp. 2d 1129, 1143 (N.D. Cal. 2008) (denying motion to dismiss Section 349 claim

where complaint alleged anticompetitive scheme with nationwide affects).  Here, the Complaint

repeatedly contains allegations of the nationwide effect of Merck's unlawful scheme.  (CAC ¶¶

11, 15, 16, 22).[29]

Merck's argument that Plaintiff Klein must plead facts demonstrating the existence of a

fiduciary relationship to properly state a claim under Section 349 (MTD at 26) is similarly out of

touch with applicable case law.  There is absolutely no precedent requiring Plaintiff Klein to

plead such a relationship.  Further, the sole case cited by Merck, *Mobil Oil Corp. v. Joshi*, 609

N.Y.S.2d 214 (N.Y. App. Div. 1995), does not involve a Section 349 claim but, rather, states that

---

[29] Limiting the application of a state consumer protection statute to purely "intrastate conduct" would
render the statute a nullity, given that the U.S. economy is interconnected.  "If the statute is limited today
as it once was to commerce that is not within the regulatory power of Congress under the commerce
clause, it is a dead letter because there are virtually no sales, in Alabama or anywhere else in the United
States, that are intrastate in *that* sense."  *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d
599, 613 (7th Cir. 1997); *see also Sheet Metal Workers Nat'l Health Fund v. Amgen, Inc.*, No. 07-5295,
2008 WL 3833577, at *12 (D.N.J. Aug. 13, 2008) (claims under multiple state statutes survived because
"the Court does not interpret the statutes to be inapplicable where the anticompetitive conduct may have
both interstate effects and, as concerns the particular state in question, intrastate impact.").

"in the absence of a confidential or fiduciary relationship between [two parties] imposing a duty to disclose, [one party's] mere silence, without some act which deceived [the other party], cannot constitute a concealment that is actionable by fraud." *Id.* at 215.  This holding has no bearing on this case and it evidences Merck's attempt to grab at straws.

**B.**   **Plaintiff Sutter Has Alleged A Valid Claim Against Merck Under The New Jersey Consumer Fraud Act.**

Merck argues that Plaintiff Sutter does not have standing to allege a claim under the New Jersey Consumer Fraud Act ("NJCFA")[30] because he does not stand in the shoes of a "consumer."  (MTD at 26-27).  However, Merck is simply wrong.

In addition to the fact that the NJCFA is to be liberally construed,[31] and that its plain language protects a broad array of persons and entities from deceptive conduct,[32] New Jersey case law expressly states that the Statute "afford[s] protection to corporate and commercial entities who purchase goods and services for use in their business operations." *Prescription Counter v. Amerisourcebergen Corp.*, No. 04-5802, 2007 WL 3511301, at *14 (D.N.J. Nov. 14,

---

[30] NJCFA, N.J. Stat. Ann. §§ 56:8-1, *et seq.*, prohibits the "act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate."

[31] *See Lee v. Carter-Reed Co.*, 4 A.3d 561, 577 (N.J. 2010) ("Because it is remedial legislation, the [NJ]CFA is construed liberally to accomplish its broad purpose of safeguarding the public.") (internal citations and quotations omitted); *Ford Motor Co. v. Edgewood Props., Inc.*, No. 06-1278, 2007 WL 4526594, at *21 (D.N.J. Dec. 18, 2007) (quoting *Bosland v. Warnock Dodge, Inc.*, No. A-1369-06T5, 2007 WL 3085857, at *2 (N.J. App. Div. Oct. 18, 2007) ("The Court has emphasized the importance of broad construction of the [Consumer Fraud Act] in light of the myriad of unforeseeable practices merchants may devise[.]")).

[32] The NJCFA affords protection to  "*[a]ny* person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act," § 56:8-19 (emphasis added), and defines "person" as "any natural person or his legal representative, partnership, corporation, company, trust, business entity or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee or cestuis que trustent thereof."  § 56:8-1(d).

2007); *id.* at *15 ("Products and services that are purchased for consumption or use in the course of business are covered by the NJCFA"); *J&R Ice Cream Corp. v. Cal. Smoothie Licensing Corp.*, 31 F.3d 1259, 1273 (3d Cir. 1994) (stating that a business entity "may qualify as a person under the Act when it finds itself in a consumer oriented situation . . . such as when it acts as the purchaser of a tow truck, . . . as the purchaser of a yacht, . . . or as the purchaser of computer peripherals.") (internal quotation marks and citations omitted).  To be protected under the NJCFA, a business entity must "use" the good within the scope of its business, and "diminish or destroy" the good's utility.  *Prescription Counter*, 2007 WL 3511301, at *14.  This is to be distinguished from "goods or services which are never consumed or used in the course of business, such as products purchased at wholesale for resale," which are not covered by the statute.  *Id.* at *15.

Merck misapplies the law to the facts of this case, arguing that Plaintiff Sutter does not have standing under the NJCFA because he did not "use" the Mumps Vaccine within the scope of his business, and thus did not "destroy" the vaccine's "utilities."  (MTD at 26-27).  To the contrary, Plaintiff Sutter does indeed purchase the Mumps Vaccine for "use" in his business, and in doing so, "destroys" the vaccine's "utilities."  Specifically, Plaintiff Sutter, and members of the Class, provide professional medical care services.  (CAC ¶ 11 ("[H]ealth care providers around the country have purchased millions of doses of Mumps Vaccine, with questionable efficacy, at artificially inflated prices.")).  Plaintiff Sutter purchased the Mumps Vaccine from Merck to administer to his patients, and the utility of the vaccine was immediately destroyed once administered.  (CAC ¶¶ 11, 14, 25, 33, 84).  This is completely different from a scenario where a wholesaler or distributor purchases a product from a manufacturer and then re-sells the product to an end-user, so that the end-user can do whatever he wishes with the product.  Here,

Plaintiff Sutter is not acting as a "middleman" but rather is purchasing the Mumps Vaccine for use in the scope of his business, and effectively consumes the vaccine in carrying out his business. To be sure, vaccines may only be administered by licensed medical personnel. That is, it would be illegal to resell the vaccine to the public in the manner Merck suggests. *See American Cyanamid Corp. v. Connaught Labs., Inc.*, 800 F.2d 306, 307 (2d Cir. 1986). Thus, Merck's argument that Plaintiff Sutter does not purchase the drug for use and consumption in his business is meritless.[33]

Merck also argues that Plaintiff Sutter failed to allege with particularity that he suffered any injury, or if he did, that such injury was caused by Merck's alleged misrepresentations. (MTD at 27-28). Again, Merck's argument fails.

The over-riding theme of the Complaint is that Merck concealed the diminished efficacy of its Mumps Vaccine to prevent competition, which would have driven down the price of the Mumps Vaccine. (CAC ¶¶ 27, 37, 86, 121-27). Absent Merck's unlawful conduct, "Plaintiffs and members of the Class would either have obtained a better price for the vaccine or stopped purchasing the vaccine from Merck altogether." (CAC ¶ 37). Plaintiff Sutter, repeatedly and with particularity, alleges such deceptive conduct on the part of Merck throughout the Complaint (CAC ¶¶ 5-11, 27, 34-110, 115-18), and alleges that such conduct ultimately caused Plaintiffs'

---

[33] The cases cited by Merck (MTD p. 27) are distinguishable from the instant matter. First, in *Schering-Plough Corp. Intron/Temodar Consumer Class Action*, No. 2:06-cv-5774, 2009 WL 2043604 (D.N.J. July 10, 2009) the court found that the plaintiff third-party payors did not have standing under the NJCFA because "they essentially serve as middlemen or insurers, paying all or part of the cost of a beneficiary's drugs in return for a stream of payments from the beneficiary." *Id.* at *32. Such is not the case here because Plaintiff Sutter purchases the Mumps Vaccine for use and consumption within the course of his business practice. Likewise, in *Central Regional Employees Benefit Fund v. Cephalon Inc.*, No. 09-3418, 2009 WL 3245485 (D.N.J. Oct. 7, 2009), the court denied standing to the third-party payor plaintiff for the same reasons as in *Schering-Plough*.

and the Class Members' injuries.  (CAC ¶¶ 11-14, 124-27, 133, 145, 155, 168, 169, 175, 186, 191, 202, 204).  Additionally, contrary to Merck's contention (MTD at 27), Plaintiff Sutter has alleged particular facts demonstrating that the Mumps Vaccine purchased from Merck was indeed ineffective, as the NIH itself has declared.  (CAC ¶¶ 115-18).

Plaintiff Sutter does not rely on the "market-wide price inflation theory" argued by Merck (MTD at 27-28) to prove causation for his consumer fraud claim.  Rather, Plaintiff's allegations are akin to a diminution-in-value due to the "diminished efficacy" of the vaccine (CAC ¶¶ 27, 95), which is permitted under the NJCFA in pleading a causal relationship between a plaintiff's loss and a defendant's unlawful conduct.  *In re Ford Motor Co. E-350 Van Prods. Liab. Litig. (No. II)*, No. 03-4558, 2008 WL 4126264, at *28 (D.N.J. Sept. 2, 2008).[34]

Further, Merck argues that Plaintiff Sutter's NJCFA claim fails because he did not "allege any facts, or specific misrepresentations upon which he relied, that caused him to purchase mumps vaccine from Merck."  (MTD at 28).  Reliance, however, is not a requirement to properly allege a claim under the NJCFA.  *See Varacello v. Mass. Mut. Life Ins. Co.*, 752 A.2d 807, 814 (N.J. App. Div. 2000); *Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d 84, 98 n. 9 (D.N.J. 2011).  Nevertheless, Plaintiff Sutter has specifically alleged reliance on Merck's misrepresentations.  (CAC ¶¶ 166, 167, 182).

---

[34] Merck's reference to *N.J. Citizens Action v. Schering Plough Corp.*, 842 A.2d 174, 178 (N.J. App. Div. 2003) (MTD at 27-28) is inapplicable because the plaintiffs in that case used a general fraud-on-the-market or price inflation theory in proving causation under the NJCFA.  *See id.* As stated above, Plaintiffs here allege no such theory.  Further, that case did not involve the monopolization claim at issue here, which effectively caused Plaintiffs and the Class Members to pay for a product that should have cost much less due to its limited value.

**VI.**   **Plaintiffs' Breach of Warranty Claims Are Legally Sufficient.**

With respect to Plaintiffs' Fourth and Fifth Claims for Relief, Merck argues that Plaintiffs lack standing to bring breach of warranty claims under Pennsylvania law because (1) the named Plaintiffs are domiciled outside Pennsylvania, and (2) there are no allegations in the Complaint that the named Plaintiffs purchased the Mumps Vaccine in Pennsylvania. (MTD at 28-32). For the reasons that follow, each of these arguments ignores applicable case law and should be rejected.

Plaintiffs' domicile and the location where they purchased Mumps Vaccine are irrelevant for purposes of determining whether Plaintiffs have standing to assert breach of warranty claims. Standing under Article III of the Constitution requires the following three elements, which Plaintiffs easily satisfy:

> (1) injury-in-fact, which is an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Danvers Motor Co.*, 432 F.3d at 291 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

Here, as direct purchasers of Merck's Mumps Vaccine at artificially inflated prices, the Complaint alleges that Plaintiffs have suffered actual injuries that are causally related to Merck's conduct and it is likely that Plaintiffs' injuries will be redressed by a favorable decision. Thus, Plaintiffs have standing to bring claims for breach of warranty.[35]

---

[35] Merck's standing argument is really a disguised choice-of-law argument, which is premature at the motion to dismiss stage. "Pennsylvania's choice-of-law analysis involves a fact-intensive inquiry that

*(continued)*

A.    **Merck's Representations Regarding The Efficacy Of The Mumps Vaccine In Its Product Labeling And Marketing Materials Constitute An Express Warranty.**

In response to Plaintiffs' Fourth Claim for Relief, Merck asserts that its representations in either its package labeling or its promotional materials regarding the efficacy of the Mumps Vaccine fail to create an express warranty.  (MTD at 28-32).  However, because Merck's representations in both package labeling and marketing materials induced Plaintiffs and Class Members to purchase the vaccine, a breach of express warranty claim is appropriate here.  As the Complaint states, Merck's statements regarding the efficacy of its Mumps Vaccine contained in the package labeling and advertising constitute express warranties that were part of the basis of the bargain between Plaintiffs and Merck. (CAC ¶ 180).

Under Pennsylvania law, an express warranty arises out of the representations or promises of the seller.  *See* 13 Pa. Cons. Stat. Ann. § 2313.  An express warranty is created by a seller, through "any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." 13 Pa. Cons. Stat. Ann. § 2313. *Parkinson v. Guidant Corp*., 315 F. Supp. 2d 741, 751 (W.D. Pa. 2004).

---

*(continued)*

can be more properly addressed at the summary judgment stage of the proceedings once the record has been more fully developed through discovery."  *Schirmer v. Principal Life Ins. Co.*, No. 08-cv-2406, 2008 WL 4787568, at *6 (E.D. Pa. Oct. 29, 2008) (citing *Kilpatrick v. Sheet Metal Workers Int'l Ass'n Local Union No. 19*, No. iv. A. 96-4862, 1996 WL 635691, *4 (E.D. Pa. Oct. 30, 1996)).  *See also Fleisher v. Fiber Composites, LLC*, No. 12-1326, 2012 WL 5381381 (E.D. Pa. Nov. 2, 2012), where plaintiffs brought a putative class action arising out of the defendant's sale of defective deck materials to plaintiffs in Pennsylvania, New Jersey, New York and Massachusetts.  *See id.* at *4 n.2.  The parties cited Pennsylvania law, but did not identify any relevant material differences in state law that impacted the breach of express warranty claim.  *See id.* at *10-11.  The court concluded that it was not required to perform a choice of law analysis on a Rule 12(b)(6) motion and applied Pennsylvania law.  *See id.*; *see also Johansson v. Cent. Garden & Pet Co.*, 804 F. Supp. 2d 257, 263 (D.N.J. 2011) ("Since the choice-of-law issue has not yet been fully briefed and may be premature, the Court declines to address the full analysis at this time.").

*Sowers v. Johnson & Johnson Med., Inc.*, 867 F. Supp. 306 (E.D. Pa. 1994), to which Merck cites, (MTD at 30), is inapposite.  In *Sowers*, a products liability action, the plaintiff was a registered nurse who suffered personal injuries as a result of exposure to the defendant's sterilization products.  *See id.* at 307.  The court found that plaintiff's claims failed because an express warranty claim must be "directed at consumers in order to induce purchases of the product" and because the label wasn't directed at the plaintiff, the label was not part of the "basis of the bargain."  *Id.* at 314 (citing *Kenepp v. Am. Edwards Labs.*, 859 F. Supp. 809, 817-18 (E.D. Pa. 1994)).

This case, however, is entirely distinguishable from *Sowers* because Plaintiffs are ***direct purchasers*** of the Mumps Vaccine.  As buyers, the product label induced Plaintiffs to purchase the vaccine.  In fact, the Complaint alleges in relevant part:

> 181.   Merck made its above-described representations intending that the representations would form the basis of the bargain between Plaintiffs and the members of the Class on one hand, and Merck on the other and the representation did, in fact, form the basis of the bargain.
>
> 182.   In the alternative, Merck made the above-described representations ***to induce Plaintiffs and the members of the Class to rely on the representations and they each did so rely (and should be presumed to have relied) on Merck's representations as a material fact in the decision(s) to purchase Mumps Vaccine***.

(CAC ¶¶ 181-82) (emphasis added).

In this context, representations made by Merck in the package insert created an express warranty, despite the fact that the labeling is required by law, because Plaintiffs considered the statements about efficacy as a material reason to purchase the vaccine.  Therefore, Plaintiffs have adequately stated a claim for breach of express warranty based upon the product label.

Merck also contends that its representations regarding the Mumps Vaccine's efficacy in marketing and advertising materials failed to create an express warranty.  (MTD at 30-31).  In

advancing this argument, Merck incorrectly asserts that the Complaint lacks allegations that any marketing materials were directed at or relied upon by any Plaintiff.  This argument is belied by even a cursory reading of the Complaint, which alleges that Plaintiffs were aware of Merck's representations regarding the efficacy of its Mumps Vaccine.

Moreover, Plaintiffs need not prove reliance here because there can be no dispute that the alleged breach formed the basis of the bargain or a term of the contract, as required under the statute.  A plaintiff in a breach of warranty claim is required to prove "reliance" only if there is a disputed issue regarding whether the promise allegedly breached was part of the basis of the bargain or a term of the contract.  *See, e.g.*, *Goodman v. PPG Indus., Inc.*, 849 A.2d 1239, 1246 (Pa. Super. Ct. 2004).  Here, Plaintiffs have properly pled that the labeling and advertising were part of the basis of the bargain and were part of a "standardized contract" between Plaintiffs and Merck.  (CAC ¶ 180).  In addition, the Complaint specifically states that Plaintiffs were aware of the representations regarding the purported 95% efficacy rate made by Merck in the marketing and advertising of the vaccine.  (*Id.* ¶¶ 180, 182).

It is clear that Plaintiffs have pled sufficient facts for this Court to conclude that they were aware of the statements regarding the vaccine's efficacy contained in Merck's promotional and advertising materials.[36]

---

[36] Regarding Merck's facile argument that the marketing materials were not directed to any named Plaintiff, (MTD p. 31), the Complaint alleges that Plaintiffs were aware of the advertising and it can certainly be inferred that marketing and advertising materials are directed to those who would purchase the product.  (CAC ¶ 180).

**B.**   **Plaintiffs Have Adequately Stated A Claim For Breach Of The Implied Warranty Of Merchantability.**

Merck argues that Plaintiffs' breach of implied warranty claim fails because the Mumps Vaccine was, and is, merchantable.  (MTD at 32-34).  To be merchantable, goods must be "fit for the ordinary purposes for which such goods are used." 13 Pa. Cons. Stat. Ann. § 2314.  The implied warranty of merchantability "arise[s] by operation of law and serve[s] to protect buyers from loss where the goods purchased are below commercial standards or are unfit for the buyer's purpose." *Altronics of Bethlehem, Inc. v. Repco, Inc.*, 957 F.2d 1102, 1105 (3d Cir. 1992).  To establish a breach of the implied warranty of merchantability, "plaintiffs must show that the equipment they purchased from defendant was defective."  *Id*.  This requires a showing "(1) that the product malfunctioned; (2) that [the plaintiff] used the product as intended or reasonably expected by the manufacturer; and (3) the absence of other reasonable secondary causes." *Id*.

Despite Merck's contentions, the Complaint establishes that the product was defective. The Complaint specifically avers that the "significantly degraded vaccine" played a role in a 2006 and 2009 mumps outbreak.  (CAC ¶¶ 95-107).  In fact, the Complaint alleges that, "Merck knew that outbreaks would occur because its vaccine had degraded over time," and that the NIH has proclaimed that the recent outbreaks "strongly suggest[] that the current vaccine is not effective."  (CAC ¶¶ 100, 117).  Clearly, Plaintiffs have alleged that the product malfunctioned even when the vaccine was used as intended.  Thus, Plaintiffs have sufficiently alleged a claim for breach of the implied warranty of merchantability.

**VII.**   **Plaintiffs' Breach Of Contract Claim Is Legally Sufficient.**

Plaintiffs allege that they purchased Mumps Vaccine that no longer provided the promised level of immunization from the mumps virus.  Contrary to Merck's argument (MTD at 34-37), these allegations are more than sufficient to establish a plausible cause of action for breach of contract.

To state a claim for breach of contract, Plaintiffs must allege "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." *Ocasio v. Prison Health Servs.*, 979 A.2d 352, 355 (Pa. Super. Ct. 2009) (quoting *CoreStates Bank N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).  Plaintiffs have adequately alleged each of these elements.  First, they alleged the existence of a contract; namely, the promises or affirmations of fact included in the product insert which formed the basis of the bargain between the parties. (CAC ¶¶ 171-72).  Second, Plaintiffs allege the vaccines, as delivered, were less effective than promised in the product packaging.  (CAC ¶¶ 47-72, 174). Finally, Plaintiffs allege that they and Class Members were injured as a result of Merck's breach by paying more (if at all) for a Mumps Vaccine that did not deliver the efficacy claimed in the product packaging. (CAC ¶ 175).

These allegations alone should be sufficient to provide Merck, a sophisticated litigant, with adequate notice to prepare a response.  *See Swierkiewicz v. Sorema*, 534 U.S. 506, 515 (2002) (stating that "[a] requirement of greater specificity for particular claims is a result that must be obtained by the process of amending the Federal Rules, and not by judicial

interpretation") (internal quotation marks omitted).[37]  Moreover, Merck's plea for more

specificity ignores the applicable legal standard, which requires Plaintiffs to merely demonstrate

their right to relief is more than "speculative."  *Twombly*, 550 U.S. at 555.

Nevertheless, Merck incorrectly contends that Plaintiffs' breach of contract claims should

be dismissed (without prejudice) for another reason – because Plaintiffs did not specify under

which state's laws the claims were asserted.  (MTD at 37-38).  As discussed above, this

argument is premature because a choice-of-law analysis in a class action is properly undertaken

in the context of the Rule 23 class certification "predominance" analysis.[38]  Moreover, breach of

contract is a common law claim and, as Merck seems to concede, the elements of that claim are

consistent among the states.[39]  "Contract law is not at its core diverse, non-uniform and

confusing."  *Am. Airlines v. Wolens*, 513 U.S. 219, 249 n.8 (1995) (internal quotations and

citation omitted); *see also Singer v. AT&T Corp.*, 185 F.R.D. 681, 692 (S.D. Fla. 1998)

("[P]revailing case law holds that at least two of [plaintiff's] claims, breach of contract and

unjust enrichment, are universally recognized causes of action that are materially the same

throughout the United States"); *Kaczmarek v. Int'l Business Machines Corp.*, 186 F.R.D. 307,

312 (S.D.N.Y. 1999) ("Claims . . . of breach of contract may be similar from state to state").

---

[37] Although *Swierkiewicz* is, on occasion, cited as abrogated, the Supreme Court explicitly stated in *Twombly* that it was not overruling *Swierkiewicz. See Twombly*, 550 U.S. at 570.

[38] Not only is this determination premature, but any hurdles the choice of law provisions create can be overcome by Plaintiffs at class certification. *See In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83, 94 (D. Mass. 2008) ("In proposing to certify a class requiring the application of the laws of numerous jurisdictions, plaintiffs must shoulder the herculean burden of conducting an extensive review of state law variances to demonstrate how grouping would work. 'If the choice-of-law and subsequent analysis show little relevant difference in the governing law, or that the law of only a few jurisdictions applies, the court might address these differences by creating subclasses or by other appropriate grouping of claims.'") (quoting MANUAL FOR COMPLEX LITIGATION (FOURTH) § 22.634, at 412 (2004)).

[39] *See* MTD at 35, finding the same elements of the claim in Alabama, New Jersey, New York and Pennsylvania, while not asserting any jurisdiction requires different elements.

Conceding the similarities in the respective state laws, Merck relies on the somewhat different limitations periods in each of the statutes. "A limitations defense," however, may only be raised by a Rule 12(b)(6) motion if the time alleged in the statement of the claims shows on its face that the cause of action has been brought beyond the statute of limitations. *Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002). Here, Plaintiffs alleged that they each purchased Mumps Vaccine directly from Merck during the Class Period. The standing of Plaintiffs is not in issue. *See Bayete v. Ricci*, No. 12-1372, 2012WL 3024240, at *3 (3d Cir. July 25, 2012). Any other issues relating to implications of various statutes of limitation on the standing of proposed Class Members are properly dealt with in the context of class certification.

## VIII.  Plaintiffs' Unjust Enrichment Claim Is Legally Sufficient.

A claim for unjust enrichment is established when a plaintiff demonstrates that another party knowingly received something of value to which it was not entitled, and the circumstances are such that it would be unjust for that person to retain the benefit. *See Allegheny Gen. Hosp. v. Phillip Morris, Inc.*, 228 F.3d 429, 447 (3d Cir. 2000). All that Plaintiffs must allege is that: (1) they conferred a benefit upon, and appreciated by, Merck; which (2) Merck equitably ought to return or provide compensation to Plaintiffs. *See id.*; *see also EBC, Inc. v. Clark Building Sys., Inc.*, 618 F.3d 253, 273 (3d Cir. 2010). These elements have been pleaded clearly. Plaintiffs allege that Merck knowingly received a benefit in the form of ill-gotten profits from sales of Mumps Vaccine. (CAC ¶ 200). These benefits flowed from Merck's unlawful, anticompetitive,

deceptive and unconscionable conduct.  (CAC ¶¶ 200-02).[40]  Plaintiffs allege that it would be inequitable to allow Merck to retain its ill-gotten gains.  (CAC ¶¶ 200, 203).

Merck offers a syllogistic argument to defeat Plaintiffs' unjust enrichment claim – because Plaintiffs plead breach of contract claims, their unjust enrichment claims must be dismissed; and since Plaintiffs plead unjust enrichment, their breach of contract claim must be dismissed.  (MTD at 38-41).  This disregards the unambiguous language of Rule 8, under which a plaintiff's claims for relief "may include relief in the alternative or different types of relief." Fed. R. Civ. P. 8(a)(3).[41]  Conversely, Merck may not argue in the alternative by selecting divergent factual theories of the market.

Moreover, Plaintiffs are unquestionably allowed to plead their unjust enrichment claims in connection with contract-based claims.  *See Fleisher v. Fiber Composites, LLC.*, No. 12-cv-1326, 2012 WL 5381381 at *14 (E.D. Pa. Nov. 2, 2012) (finding "plaintiffs may plead alternative theories of breach of contract and unjust enrichment where 'there is any question as to the validity of contract in question'") (quoting *AmerisourceBergen Drug Corp. v. Allscripts*

---

[40] It is well-settled that overpayment is a basis for an unjust enrichment claim. *See Pappas v. Unum Life Ins. Co.*, No. 97-cv-7162, 2000 WL 1137730, at *3-4 (E.D. Pa. Aug. 10, 2000) (permitting recovery of overpayment of insurance benefits under unjust enrichment theory); RESTATEMENT OF RESTITUTION § 1 cmt. d (1937) (citing accidental overpayment as a basis for unjust enrichment). Merck's assertion that to adequately plead unjust enrichment, Plaintiffs must allege that they did not receive the Mumps Vaccine they purchased, or that it was ineffective, is belied by the case law.  For example, in *In re Lorazepam & Clorazepate Antitrust Litig.*, the court found plaintiffs adequately alleged the defendants' benefit at their expense where plaintiffs claimed to have absorbed millions of dollars in overcharges caused by defendants' monopolization of the market for certain anti-anxiety medications.  295 F. Supp. 2d 30, 50-51 (D.D.C. 2003); *see also In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 546 (D.N.J. 2004) ("Defendants have failed to cite a single case finding that payment or receipt of anything of value from a defendant will defeat a plaintiff's claims for unjust enrichment. Determinations that depend on evaluating whether a benefit received approximates the value paid are primarily questions of fact, and as such, are not appropriately addressed on a motion to dismiss.")

[41] In fact, Plaintiffs specified in their Complaint that the unjust enrichment claim was "in addition or in the alternative" to their claims of breach of contract and breach of express and implied warranties. (CAC ¶ 199).

*Healthcare, LLC.,* 10-cv-6087, 2011 WL 3241356, at \*3 (E.D. Pa. July 29, 2011)); *Atl. Paper Box Co. v. Whitman's Chocolates,* 844 F. Supp. 1038, 1042-43 (E.D.Pa.1994) (plaintiffs may allege "alternative theories of recovery based on both breach of contract and unjust enrichment even when the existence of a valid contract would preclude recovery under unjust enrichment").[42]  All but one of the six cases Merck cites in support of its argument to the contrary were on summary judgment motions or post-ruling, and, thus, are inapplicable here.[43] In *Wiseberg v. Toyota Motor Corp.*, the sole 12(b)(6) dismissal decision cited by Merck, the court dismissed the unjust enrichment claim only after determining there was no bona fide dispute between the parties as to whether a valid contract existed between them.  No. 11-3776, 2012 WL 1108542, at \*12 (D.N.J. Mar. 30, 2012).  Because Merck has taken the position that Plaintiffs have not alleged sufficient facts to support a claim that a contract ever existed (MTD at 35), a bona fide dispute exists here and, consequently, Plaintiffs are permitted to plead unjust enrichment in the alternative.

---

[42] *See also In re G-Fees Antitrust Litig.,* 584 F. Supp. 2d 26, 46 n.15 (D.D.C. 2008) (denying defendants' motion to dismiss; "Rule 8 . . . expressly permits pleading in the alternative of the sort employed by plaintiffs here, even where they appear to have an adequate remedy at law . . . . 'It is not generally a ground for dismissal of a complaint asserting equitable claims that the plaintiff has an adequate remedy at law.'") (citation omitted); *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d at 699 ("[C]ourts often award equitable remedies under common law claims for unjust enrichment in circumstances where claims based on contract or other state law violations prove unsuccessful"); *Prudential Ins. Co. of Am. v. Clark Consulting, Inc.*, 548 F. Supp. 2d 619, 624 (N.D. Ill. 2008) (denying motion to dismiss and noting that, "if this court determines in subsequent proceedings that an enforceable contract exists between the parties, then Prudential's unjust enrichment claim cannot stand.  At this stage, however, Prudential has properly alleged the unjust enrichment claim as an alternative to its breach of contract claim.").

[43] Indeed, courts have held that dismissing an equitable count, even at the summary judgment stage, is *not* appropriate.  *See, e.g.,  McBride v. Life Ins. Co. of Va.*, 190 F. Supp. 2d 1366, 1378 (M.D. Ga. 2002) (denying summary judgment because "[a]t trial the jury will be instructed that Plaintiff may recover on his fraud claim or unjust enrichment claim only if the jury finds that there was no breach of contract.") (quotation marks and citation omitted).

Merck also incorrectly argues that Plaintiffs' unjust enrichment claims should be dismissed because Plaintiffs do not specify under which state laws they are pursuing these claims.  (MTD at 41).  Merck tries to accelerate the choice of law question by baiting Plaintiffs and the Court into a determination of what law applies to Merck's motion.  However, the Court need not conduct a choice of law analysis because, as detailed above, Plaintiffs have adequately pleaded their unjust enrichment claim.  Regardless, the choice of law analysis in a class action is properly undertaken in the context of the class certification predominance analysis.  *See In re Hypodermic Prods. Antitrust Litig.*, No. 05-cv-1602, 2007 WL 1959225, at *16 (D.N.J. June 29, 2007) ("To the extent that Defendant moves to dismiss Plaintiffs' claims of unjust enrichment on the basis that certain individual states impose additional requirements . . . the Court likewise determines that it is premature to consider these requirements on a state by state basis, at this time."); *see also Rios v. State Farm Fire and Cas. Co.*, 469 F. Supp. 2d 727, 740-42 (S.D. Iowa 2007) (denying motion to strike and dismiss nationwide class allegations on breach of contract and unjust enrichment claims as premature).

Moreover, because a claim for unjust enrichment is universally recognized and uniform, Plaintiffs' allegations are sufficient to survive dismissal.  Courts routinely recognize that the elements of an unjust enrichment claims are virtually identical in all states.  *See In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 58 (D.N.J. 2010) ("While there are minor variations in the elements of unjust enrichment under the laws of the various states, those differences are not material and do not create an actual conflict."); *In re Ford Motor Co.*, 2008 WL 4126264, at * 21 (holding that the state laws of unjust enrichment are "universally recognized causes of action that are materially the same throughout the United States.") (citing *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 697 n.40 (S.D. Fla. 2004));

*Singer*, 185 F.R.D. at 692 (noting state law claims of unjust enrichment are "universally recognized causes of action that are materially the same throughout the United States.").[44]

However, should the Court determine that the Complaint must be more specific with regard to which states' law supports their breach of contract or unjust enrichment claims, Plaintiffs request leave to amend their Complaint, or to file some other type of pleading, indicating the states under which they intend to allege these claims.

---

[44]The cases Merck cites (MTD at 41) are unavailing because they involve indirect purchaser plaintiffs. In *In re Flonase Antitrust Litig.*, the court noted that some states require a plaintiff to "provide more than a bare assertion that attempting to exhaust their remedies against the party with whom they are in privity would be futile." 610 F. Supp. 2d 409, 419 n.3 (E.D. Pa. 2009) (citing *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525-26 (Tenn. 2005)). The plaintiffs in *Flonase* and *Freeman*, however, were *indirect* purchasers of the allegedly price fixed product. Thus, the court in *Freeman* noted that the plaintiff had not exhausted its remedies with the intermediate seller. Here, Plaintiffs are in direct privity with Merck and have filed a Complaint seeking remedies, to which Merck filed this motion to dismiss. Thus, in this case (unlike *Freeman* and *Flonase*) it is clear that any further attempt to exhaust their remedies with Merck would be futile. The fact that some courts require a more definite statement regarding the exhaustion of remedies has no application in this case. Similarly, Merck's reliance on *In re Wellbutrin XL Antitrust Litig.*, also an indirect purchaser case, is misguided. 260 F.R.D. 143 (E.D. Pa. 2009). Moreover, unlike the present case, in which Plaintiffs allege unjust enrichment under state common-law (CAC ¶ 17), plaintiffs in *Wellbutrin* specified *no* source of law on which they were basing their unjust enrichment claims. *See id.* at 167 (E.D. Pa. 2009). The *Wellbutrin* court ruled that there was no unjust enrichment claim under federal common law, a decision that Plaintiffs do not dispute.

## CONCLUSION

For the foregoing reasons, Merck's motion to dismiss Plaintiffs' Consolidated Amended Complaint should be denied.  Plaintiffs have sufficiently stated claims against Merck for monopolization in violation of Section 2 of the Sherman Act, violation of state consumer protection laws, breach of contract, breach of Pennsylvania's express and implied warranty laws, and unjust enrichment.


Dated: January 11, 2013                         Respectfully Submitted,

               BY:     /s/ Jeffrey L. Kodroff
                       Jeffrey L. Kodroff
                       John A. Macoretta
                       Mary Ann Geppert
                       **SPECTOR ROSEMAN KODROFF &**
                       **WILLIS, P.C**.
                       1818 Market Street, Suite 2500
                       Philadelphia, PA 19103
                       Telephone: (215) 496-0300
                       jkodroff@srkw-law.com
                       jmacoretta@srkw-law.com
                       mgiorno@srkw-law.com

                       Hollis Salzman
                       Bernard Persky (*pro hac vice* pending)
                       Kellie Lerner
                       **LABATON SUCHAROW LLP**
                       140 Broadway, 34th Floor
                       New York, New York 10005
                       Telephone:  (212) 907-0700
                       hsalzman@labaton.com
                       bpersky@labaton.com
                       klerner@labaton.com

                       *Interim Co-Lead Counsel for*
                       *Plaintiffs and the Putative Class*

Richard Golomb
Steven Resnick
**GOLOMB & HONIK, P.C.**
1515 Market Street
Suite 1100
Philadelphia, A 19102
Telephone: (215) 985-9177

Stephen Dampier
**DAMPIER LAW FIRM, P.C.**
55 North Section Street
Fairhope, AL 36532
Telephone: (251) 929-0900
stevedampier@dampierlaw.com

R. Edward Massey, Jr.
**CLAY, MASSEY & ASSOCIATES, P.C.**
509 Church Street
Mobile, AL 36602

Brian D. Penny
Mark S. Goldman
**GOLDMAN SCARLATO KARON & PENNY, P.C.**
101 E. Lancaster Avenue, Suite 204
Suite 1100
Wayne, PA 19087
Telephone: (484) 342-0700
penny@skplaw.com
goldman@gskplaw.com

Robert Kitchenoff
Mindee Ruben
**WEINSTEIN KITCHENOFF & ASHER LLC**
1845 Walnut Street
Suite 1100
Philadelphia, Pennsylvania 19103
Telephone: (215) 545-7200
kitchenoff@wka-law.com
reuben@wka-law.com

Lee Albert
**MURRAY FRANK LLP**
275 Madison Avenue
Suite 801
New York, New York 10016
Telephone: (212) 682-818
lalbert@murrayfrank.com

Kevin P. Roddy
**WILENTZ, GOLDMAN & SPITZER, P.A.**
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ  07095
Telephone: (732) 636-8000
kroddy@wilentz.com

Jayne A. Goldstein
Natalie Finkelman Bennett
**SHEPHERD, FINKELMAN, MILLER & SHAH, LLP**
35 East State Street
Media, Pennsylvania 19063
Telephone: (610) 891-9880
jgoldstein@sfmslaw.com
nfinkelman@sfmslaw.com

James B. Zouras
Ryan F. Stephan
Mark B. Goldstein
**STEPHAN ZOURAS, LLP**
205 N. Michigan Avenue, Suite 2560
Chicago, Illinois 60601
Telephone: (312) 233-1550
jzouras@stephanzouras.com
rstephan@stephanzouras.com
mgoldstein@stephanzouras.com

James P. Carroll Jr.
**LAW OFFICES OF JAMES P. CARROLL JR.**
311 West 5th Street, Suite 1201
Austin, TX 78701
Telephone:  512-334-9749

Breaux Ballard Rogers
**BALLARD ROGERS LAW, PLLC**
539 W. Market St., Suite 300
Louisville, KY 40202
Telephone: (502) 582-2292

*Counsel for Plaintiffs and the Putative Class*