**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: MERCK MUMPS VACCINE ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | Master File No. 2:12-cv-03555(CFK) |

# DEFENDANT MERCK'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR RECONSIDERATION OF THE COURT'S JULY 27, 2023 ORDER OR, ALTERNATIVELY, FOR CERTIFICATION OF INTERLOCUTORY APPEAL PURSUANT TO 28 U.S.C. § 1292(b)

# TABLE OF CONTENTS


**Page**

INTRODUCTION ........ 1

BACKGROUND ........ 5

I. Factual Overlap of the FCA and Antitrust Claims ........ 5

II. Summary Judgment Ruling in the FCA Case. ........ 7

III. Summary Judgment Ruling in the Antitrust Case ........ 7

LEGAL STANDARDS ........ 9

I. Reconsideration Under Fed. R. Civ. P. 54(b) ........ 9

II. Certification for Interlocutory Appeal Under § 1292(b) ........ 9

ARGUMENT ........ 10

I. Reconsideration Is Warranted of the Court's Conclusion That *Noerr-Pennington*'s Sham Exception Could Apply to Successful, Non-adjudicatory Petitioning Activity. ........ 10

A. No Precedent Supports Application by a Jury of *Noerr-Pennington*'s Sham Exception to Submissions in Non-Adjudicatory Settings ........ 10

B. The Alleged Misstatements by Merck to FDA Cannot—As a Matter of Law—Satisfy the Sham Exception's "Objectively Baseless" Requirement ........ 12

II. Reconsideration Is Warranted on the Court's Conclusion That Plaintiffs Raised a Genuine Issue of Material Fact on Antitrust Injury. ........ 16

III. In the Alternative, This Court Should Certify Its Antitrust Decision for Interlocutory Appeal Under 28 U.S.C. § 1292(b). ........ 20

A. This Court's *Noerr-Pennington* Holding Warrants Certifying the Antitrust Decision for Immediate Appeal. ........ 20

B. This Court's Antitrust Injury Holding Warrants Certifying the Antitrust Decision for Immediate Appeal. ........ 24

CONCLUSION ........ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Anthanassious*,
418 F. App'x 91 (3d Cir. 2011) ....................9

*Armstrong Surgical Ctr., Inc. v. Armstrong Cnty. Mem'l Hosp.*,
185 F.3d 154 (3d Cir. 1999)....................15, 16

*Bedoya v. Am. Eagle Express*,
No. 14-cv-2811, 2017 WL 4330351 (D.N.J. Sept. 29, 2017)....................23

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001)....................15, 17

*Bush v. Adams*,
629 F. Supp. 2d 468 (E.D. Pa. 2009)....................10, 20

*In re Canadian Imp. Antitrust Litig.*,
470 F.3d 785 (8th Cir. 2006) ....................16

*Cheminor Drugs, Ltd. v. Ethyl Corp.*,
168 F.3d 119 (3d Cir. 1999)....................13, 14, 15, 23

*In re Chocolate Confectionary Antitrust Litig.*,
607 F. Supp. 2d 701 (M.D. Pa. 2009)....................22

*City of Pittsburgh v. W. Penn Power Co.*,
147 F.3d 256 (3d Cir. 1998)....................16

*In re Energy Future Holdings Corp.*,
904 F.3d 298 (3d Cir. 2018)....................9

*Federal Trade Comm'n v. AbbVie Inc*,
976 F.3d 327 (3d Cir. 2020)....................15

*Fidelity Fed. Sav. & Loan Ass'n v. Felicetti*,
813 F. Supp. 332 (E.D. Pa. 1993) ....................12

*In re Flonase Antitrust Litig.*,
795 F. Supp. 2d 300 (E.D. Pa. 2011) ....................11

*Florence v. Bd. of Chosen Freeholders*,
657 F. Supp. 2d 504 (D.N.J. 2009) ....................23

*Gay v. A.O. Smith Corp.*,
No. 2:19-CV-1311, 2022 WL 2829887 (W.D. Pa. Apr. 21, 2022)....................................9

*Katz v. Carte Blanche Corp.*,
496 F.2d 747 (3d Cir. 1974).................................................................20, 21, 23, 24

*Knipe v. SmithKline Beecham*,
583 F. Supp. 2d 553 (E.D. Pa. 2008) ............................................................ *passim*

*Kottle v. Nw. Kidney Ctrs.*,
146 F.3d 1056 (9th Cir. 1998) ................................................................5, 11, 14, 23

*U.S. ex rel. Krahling v. Merck & Co.*,
44 F. Supp. 3d 581 (E.D. Pa. 2014) .......................................................................5

*Krahling v. Merck*,
No. 2:10-cv-04374-CFK, ECF No. 350 (July 27, 2023) ..................................... *passim*

*L.R. v. Manheim Twp. Sch. Dist.*,
540 F. Supp. 2d 603 (E.D. Pa. 2008) .............................................................20, 21

*In re Lipitor Antitrust Litig.*,
868 F.3d 231 (3d Cir. 2017)...............................................................................11

*LM Gen. Ins. Co. v. LeBrun*,
No. CV 19-2144-KSM, 2020 WL 7770233 (E.D. Pa. Dec. 30, 2020) ..........................21

*In re Mallinckrodt PLC*,
638 B.R. 57 (D. Del. 2021)...........................................................................17, 24

*Mercatus Grp. LLC v. Lake Forest Hosp.*,
641 F.3d 834 (7th Cir. 2011) ..................................................................... *passim*

*Pereira v. Foot Locker, Inc.*,
No. 07-cv-2157, 2010 WL 300027 (E.D. Pa. Jan. 25, 2010)...................................22

*In re Pharmacy Benefit Managers Antitrust Litig.*,
582 F.3d 432 (3d Cir. 2009).................................................................................9

*Professional Real Est. Inv., Inc. v. Columbia Pictures Indus., Inc.*,
508 U.S. *49 (1993)*............................................................................................15

*Qazizadeh v. Pinnacle Health Sys.*,
214 F. Supp. 3d 292 (M.D. Pa. 2016).....................................................................9

*RSA Media, Inc. v. AK Media Grp., Inc.*,
260 F.3d 10 (1st Cir. 2001)................................................................................16

*Sandoz Pharms. v. Richardson-Vicks*,
902 F.2d 222 (3d Cir. 1990)....................17

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
579 U.S. 176 (2016)....................13

*In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*,
868 F.3d 132 (3d Cir. 2017).................... *passim*

*Woodlen v. Jimenez*,
173 F. App'x 168 (3d Cir. 2006)....................9

**Statutes**

21 U.S.C. § 337(a)....................17

21 U.S.C. § 352(a)(1)....................2

21 U.S.C. § 355(o)(4)(A)....................2, 17

28 U.S.C. § 1292(b).................... *passim*

**Other Authorities**

21 C.F.R. § 10.30 (2022)....................11

21 C.F.R. § 600.14(b)(1)(ii) (2022)....................10

Fed. R. Civ. P. 42(a)....................6

Fed. R. Civ. P. 54(b)....................9

## INTRODUCTION

In rulings issued the same day, this Court granted summary judgment to Merck in Relators' case brought under the False Claims Act ("FCA") and denied summary judgment to Merck on Plaintiffs' claims brought under the federal antitrust laws. Both cases, however, are premised on the same core theory that Merck's mumps vaccine label is false and misleading because it contains misstatements about shelf life, potency, and seroconversion rates. According to *Relators* in the FCA case, those misstatements were material to FDA and CDC because, had those agencies known about those misstatements, the government would have stopped purchasing Merck's mumps vaccines as part of the Vaccines for Children program. According to *Plaintiffs* in the antitrust case, those misstatements caused antitrust injury to physicians purchasing the vaccine because, had FDA known about the misstatements, it would have required Merck to change the label in a way that may have "lowered the bar" and allowed GSK to bring a new mumps vaccine to market sooner.

The same lack of disputed facts should have doomed both theories. As this Court correctly found in the FCA case, it is undisputed that FDA—despite its obligation to act when a label is false and misleading—has taken no action to change any of the statements on the label that Relators and Plaintiffs complain are false and misleading or resulted from allegedly false information submitted by Merck to FDA. Mem. Op., *Krahling v. Merck*, No. 2:10-cv-04374-CFK, ECF No. 350 at 30 (July 27, 2023) ("FCA Decision") ("Similarly, the FDA has not taken any action in response to this lawsuit or Dr. Kessler's submissions. Because these agencies are under a duty to review the information before them, the lack of response by both the FDA and CDC strongly indicate that Relators' allegations are not material." (citing *Advanced Disposal Servs. E., Inc., v. N.L.R.B.*, 820 F.3d 592, 604 (3d Cir. 2016); 21 U.S.C. § 355(o)(4)(A))). As explained, the government has actual knowledge of all the facts and evidence in this case surrounding the supposedly false labeling claims relating to shelf life, potency, and seroconversion rates, and, despite all of this knowledge, "these facts

were simply not persuasive to the CDC, or any other agencies [including FDA], to prompt them to take any action." *Id.* at 33.

That lack of action by FDA matters in an antitrust case that is premised entirely on the notion that Merck's allegedly false label caused FDA to hold GSK to an artificially high standard.[1] This Court has already said as much: "[I]f the Government considered anything material [from the alleged misstatements], it would have raised the issue with Merck and required them to take corrective action." *Id.* at 36. FDA's decision not to take corrective action means that *FDA does not consider anything false or misleading about the label for Merck's mumps vaccine*. There is no evidence that FDA would have required Merck to change statements on its label that Plaintiffs point to as the barrier to GSK's ability to obtain regulatory approval. Rather, the undisputed evidence is that FDA required GSK to show non-inferiority through studies and assays, and Merck's labeling did not impede that process.

Reconsideration of the Court's denial of summary judgment is therefore necessary. The FCA Decision underscores that FDA has had the relevant evidence in front of it for years, yet still does not consider anything about Merck's label false or misleading; if it did, FDA would take action. 21 U.S.C. § 355(o)(4)(A); *see also* 21 U.S.C. § 352(a)(1) ("A drug or device shall be deemed to be misbranded. . . [i]f its labeling is false or misleading in any particular."). Respectfully, the Court misapprehended the legal consequence for Plaintiffs' antitrust claims of its FCA Decision finding no genuine dispute of material fact as to whether any allegedly false and

---

1 *See, e.g.*, Pls.' Summ. J. Opp. at 2, ECF 279 ("Although GSK correctly blames the delay of its Priorix launch on its inability to mirror Merck's Mumps Vaccine labels, it had no way to know that those labels were riddled with false and misleading information."); *id.* at 4 ("Merck successfully avoided competition by marketing Mumps Vaccines with false and misleading labels, and undertaking a massive scheme to conceal the truth."); *id.* at 18 (relying on Dr. Kessler's opinions); *id.* at 31 ("The dispute is whether Merck's fraudulent label claims excluded GSK."); *id.* at 37 ("The centerpiece of that scheme was Merck's refusal to revise or remove claims on Merck's Mumps Vaccine labels that it knew to be false and misleading.").

misleading aspects of the label are material to the government. Reconsideration is thus warranted on two aspects of this Court's July 27, 2023 order (the "Antitrust Decision").

*First*, the sham litigation exception to *Noerr-Pennington* immunity cannot apply to the limited set of FDA communications that Plaintiffs rely on—Merck's responses to FDA Form 483 and Warning Letter, and certain of its biological product deviation reports ("BPDRs") (collectively, the "Petitions"). The sham exception is inapplicable where (1) the submission is made in a *non-adjudicatory* context, or (2) the petition is acted on favorably by the government. The Petitions here were both. In addition to being submitted in the type of non-adjudicatory setting that no court has ever held subject to the sham exception, Merck's Petitions also received favorable treatment from FDA. Specifically, FDA did not require any labeling changes then (or now) based on any statements Plaintiffs say are false and misleading and that delayed GSK's regulatory approval. It is also undisputed that Merck petitioned FDA to lower the labeled potency, and after extensive discussions, FDA agreed. This Court should refrain from being the first to rule that a party's *successful* communications with an agency could nonetheless trigger the sham exception; it is established law that the *outcome* of a defendant's petitioning is a necessary factor courts must consider as part of the sham analysis, and here that outcome was in Merck's favor. On reconsideration, this Court should therefore hold that the Petitions are immune under *Noerr-Pennington* and cannot constitute anticompetitive conduct under the Sherman Act.

*Second*, Plaintiffs cannot make out an antitrust injury if there is nothing false or misleading about Merck's label for a straightforward reason: In the but-for world in which FDA had access to all the "evidence" of alleged label fraud, FDA still "would have" required GSK to mirror the same exact label that it in fact had to mirror. The Court has already ruled as much in the FCA case by noting that in the real world, FDA *has* all the evidence of alleged label fraud and still has taken no

action to require that Merck change its label. As the Court correctly observed, many years after FDA was given all this evidence of supposed falsity in Merck's label, "the FDA has continued to license Merck's mumps vaccines" without requiring any changes to the statements that Plaintiffs, like Relators, say are false and misleading on Merck's label. FCA Decision 37.

This resolves the FDA causation question in favor of Merck. Under Third Circuit law, where regulatory approval is a prerequisite to entering the market, an antitrust plaintiff must "produce evidence from which a reasonable jury could conclude that it is more likely than not that [the competitor] ***would have*** obtained" that regulatory approval absent the challenged conduct "[i]n order to withstand summary judgment." *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 167 (3d Cir. 2017) (emphasis added). Not only can Plaintiffs not meet the "would have obtained approval" standard, they cannot even show that GSK "might" have obtained approval under some different label had FDA known of the alleged fraud—because FDA's actions show that it does not consider the label fraudulent at all. *Id.* ("Evidence showing that [a company] ***may*** have been able to obtain a license does not meet" the causation standard at summary judgment). Under the controlling standard, Plaintiffs have no possible case to move forward on. On reconsideration, this Court should therefore hold that Plaintiffs have not presented any genuine issue of material fact as to whether FDA "would have" revised its thinking about the accuracy of Merck's label—and thus changed its approach with GSK—had it known of the alleged fraud. Plaintiffs' antitrust claims cannot stand without forging this requisite regulatory causal link.

Alternatively, this Court should issue an order certifying its summary judgment decision for interlocutory appeal or amend the Antitrust Decision to do so. *See* 28 U.S.C. § 1292(b). Whether *Noerr-Pennington*'s sham exception can apply to a company's communications with an agency that are (1) non-adjudicatory and (2) successful is "a controlling question of law as to which

there is substantial ground for difference of opinion," and an immediate appeal "may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). No court has ever applied the sham exception in either of these circumstances— let alone both of them occurring together— and courts have regularly indicated that an adjudicatory posture and lack of success are key facts for the exception's application. *See, e.g.*, *Mercatus Grp. LLC v. Lake Forest Hosp.*, 641 F.3d 834 (7th Cir. 2011) (addressing adjudicatory nature); *Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1061 (9th Cir. 1998) (addressing successful outcome). If the Third Circuit agrees that the sham exception cannot apply here, then the Plaintiffs have no basis on which to move this case forward. Similarly, the Court's holding on antitrust injury merits appellate review, for it too presents a controlling question of law, the answer to which would also end this case. Interlocutory appeal of the Antitrust Decision is therefore likely to "spare time and expense for both Court and litigants." *Knipe v. SmithKline Beecham*, 583 F. Supp. 2d 553, 601 (E.D. Pa. 2008).

## BACKGROUND

### I. <u>Factual Overlap of the FCA and Antitrust Claims.</u>

As the motion-to-dismiss ruling highlighted, "Plaintiffs based their Complaint on the *qui tam* action filed by the Relators." *U.S. ex rel. Krahling v. Merck & Co.*, 44 F. Supp. 3d 581, 588 (E.D. Pa. 2014). "Based on the same allegations, Plaintiffs allege that Defendant's manipulation and misrepresentation of the seroconversion rate of the Mumps Vaccine to the United States government, led to Defendant's monopoly of the relevant market in violation of the Sherman Act and violations of various state laws." *Id.*; *see also id.* at 597 ("Plaintiff adopts as true all of Relators' factual allegations in the Amended Complaint[.]").

Thus, from the beginning, it has been clear that if FDA did not view the seroconversion rate and related specifications on Merck's label as "falsified," then those statements on the label were not improperly "excluding competition from the relevant market." *Id.* Moreover, both cases

have been joined at the hip since inception. In August 2012, the Court consolidated the FCA and Antitrust cases under Federal Rule of Civil Procedure 42(a) because they involved the "same or similar subject matters." ECF 23 at 1. The Court combined the Rule 16 conference, ECF 69, and the parties jointly submitted the scheduling, protective, and ESI orders. ECF 69, 88, 89. Counsel for Plaintiffs and Relators shared responsibilities in depositions and shared retention of experts, including Dr. David Kessler. *See, e.g.*, ECF 205, 253.

As the case moved to summary judgment, the Plaintiffs and Relators focused on the potency, shelf-life and seroconversion information on Merck's label. Plaintiffs and Relators also focused on Merck's communications with FDA in the late 1990s related to the discovery that, although Merck understood for three decades that the label on its mumps vaccine stated a minimum release potency—i.e., the amount of live virus in a vaccine when the vaccine is approved for release to the market—FDA wanted the labeled potency to reflect the end-expiry potency—i.e., the amount of live virus in a vaccine at the end of its shelf life, which has always been twenty-four months. FCA Decision 3-5; Antitrust Decision 7-8. Merck began to increase the release potency while working closely with FDA to design a non-inferiority study known as Protocol 007 that would test whether a less potent dose of the vaccine would have similar immunogenic effects to those of a vaccine dose at the labeled potency level. FCA Decision 8-12; Antitrust Decision 10-13. Merck's communications with FDA included responding to a Form 483 and Warning Letter relating to potency. FCA Decision 5-8; Antitrust Decision 8-10.

In 2004, Merck submitted two supplemental Biologics License Applications ("sBLAs") to FDA requesting a change in the label's potency figure and a switch to using recombinant human albumin ("rHA"). Both were ultimately approved. FCA Decision 12-14; Antitrust Decision 13.

Also in 2004, Merck submitted its ProQuad Biologic License Application ("BLA"), which was approved. FCA Decision 14; Antitrust Decision 14.

## II. Summary Judgment Ruling in the FCA Case.

In 2010, two former Merck lab technicians brought the FCA suit, where "[t]he crux" of their allegations was that Merck "'fraudulently misled the government and omitted, concealed, and adulterated material information regarding the efficacy of its mumps vaccine'" to "'deliberately obfuscate[] information about the vaccine's lessening efficacy.'" FCA Decision 18 (quoting *Krahling*, 44 F. Supp. 3d at 586, 591, 594). In seeking to avoid summary judgment, Relators argued that Merck's sales of its mumps vaccines to the government involved factual and legal falsity with respect to potency, shelf-life, and "mumps protection and licensure." *Id.* at 23-24. The Court's summary judgment ruling explained that "even assuming *arguendo*" that any such falsity existed, none of "these so-called false claims" were material to the government. *Id.* at 24. Not only did the government repeatedly investigate Relators' claims, but the Court—at Relators' *and Plaintiffs*' request—authorized their joint expert, former FDA Commissioner Dr. David Kessler, to submit his views directly to FDA and CDC (among others) so those agencies could determine if any action was warranted in response. *Id.* at 29-30; *see also* ECF 253 at 1 n.2. Dr. Kessler did so, and the agencies took no action in response. FDA's continued inaction shows that the "facts were simply not persuasive" enough "to prompt" FDA "to take any action." FCA Decision 33. In other words, after FDA and CDC considered all available evidence from this litigation, FDA kept the label exactly as is with regard to the statements that Relators argued rendered Merck's claims for payment "false."

## III. Summary Judgment Ruling in the Antitrust Case.

Plaintiffs' antitrust suit, filed after the FCA suit was unsealed, "arises from the same underlying allegations of fraud that spawned the related False Claims Act ('FCA') case." Antitrust

Decision 1. Plaintiffs rely on the very same label statements—potency, shelf-life, and seroconversion rate—and say that they made Merck's label "false and misleading" and that FDA, had it known the truth, would have made Merck change its label and then allowed GSK to show that it was non-inferior to the different (and lower) terms, rather than what was actually on the label. *Id.* at 26-28. According to Plaintiffs, "false and misleading information" on Merck's "labels" prevented GSK from "mirror[ing]" those labels and thus launching Priorix earlier than it did. Pls.' Summ. J. Opp. at 2, ECF 279. In short, their case depends on being able to show that "Merck successfully avoided competition by marketing Mumps Vaccines with false and misleading labels." *Id.* at 4. That is why Merck emphasized on page 1 of its summary judgment brief and at oral argument that if the Court concludes in the FCA case that "there was no actionable fraud by Merck, then dismissal of Plaintiffs' claims in this case would be required as well for failure to establish anticompetitive conduct in connection with their Sherman Act claim and any misrepresentation or deceptive behavior for the state-law consumer protection claims." Def.'s Memo. Summ. J., ECF 273 at 1 n.1 (Jan. 10, 2020).

The Court made two rulings in denying summary judgment that are relevant here. *First*, as to the *Noerr-Pennington* doctrine, the Court agreed that Merck's various applications and submissions to FDA were petitioning activity, but found that there was a genuine issue of material fact as to whether the "sham exception" to that doctrine applied to a limited set of communications, *i.e.*, the Petitions. Antitrust Decision 27. *Second,* this Court held that "there is sufficient evidence to raise a genuine issue of material fact as to whether it was Merck's conduct that was a material cause of Plaintiffs' injuries." *Id.* at 31. This Court stated that "while a jury may well conclude that [1] GSK's independent business reasons and [2] the FDA decision-making process break[s] the chain of causation, whether" that process is "the proximate cause of Plaintiffs' injury is a

question of fact for the jury." *Id.* at 32. Although the Court addressed the circumstances surrounding GSK's decision making, it did not grapple with whether Plaintiffs came forward with some evidence to suggest that, had FDA know of Merck's alleged fraud, FDA would have accommodated GSK with different regulatory requirements for approval. *See id.* at 30-32.

## LEGAL STANDARDS

### I. <u>Reconsideration Under Fed. R. Civ. P. 54(b).</u>

An order resolving fewer than all of the claims among all of the parties is "may be revised at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." Fed. R. Civ. P. 54(b); *see also, e.g.*, *Woodlen v. Jimenez*, 173 F. App'x 168, 170 (3d Cir. 2006) (citing Rule 54(b) and affirming district court's power to reconsider summary judgment order). "[T]he same would be true even in the absence of that rule." *In re Anthanassious*, 418 F. App'x 91, 95 (3d Cir. 2011). The district court has "inherent power over interlocutory orders, and can reconsider them when it is consonant with justice to do so." *In re Energy Future Holdings Corp*., 904 F.3d 298, 310 (3d Cir. 2018) (emphasis omitted). Thus, "reconsideration of [interlocutory] orders may be had even if the movant cannot show" the sort of intervening change in law, new evidence, or clear error required for reconsideration of a final judgment, *Qazizadeh v. Pinnacle Health Sys*., 214 F. Supp. 3d 292, 295 (M.D. Pa. 2016). Because of this broader discretion to reconsider an interlocutory order than a final one, *see*, *e.g.*, *Gay v. A.O. Smith Corp.*, No. 2:19-CV-1311, 2022 WL 2829887, at *1 (W.D. Pa. Apr. 21, 2022), reconsideration can be granted "whenever it appears that a previous ruling . . . might lead to an unjust result," *In re Pharmacy Benefit Managers Antitrust Litig.*, 582 F.3d 432, 439 (3d Cir. 2009).

### II. <u>Certification for Interlocutory Appeal Under § 1292(b).</u>

An order can be certified for interlocutory appeal when it "involves a controlling question of law as to which there is substantial ground for difference of opinion," and "an immediate appeal

from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). Thus, the Court can certify the Antitrust Decision for immediate appeal under section 1292(b) so long as it finds that: "(1) the order involves a 'controlling question of law;' (2) there is a 'substantial ground for a difference of opinion' as to the order's correctness; and (3) an immediate appeal will 'materially advance the ultimate termination of the litigation.'" *Bush v. Adams*, 629 F. Supp. 2d 468, 474 (E.D. Pa. 2009) (quoting *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 754 (3d Cir. 1974)).

## <u>ARGUMENT</u>

### I. Reconsideration Is Warranted of the Court's Conclusion That *Noerr-Pennington*'s <u>Sham Exception Could Apply to Successful, Non-adjudicatory Petitioning Activity.</u>

#### A. No Precedent Supports Application by a Jury of *Noerr-Pennington*'s Sham Exception to Submissions in Non-Adjudicatory Settings.

The Court agreed with Merck that all of Merck's submissions to FDA "could be considered petitioning activity," and thus were covered by *Noerr-Pennington*. Antitrust Decision at 26. Plaintiffs identified three communications between FDA and Merck that they argued fell with the "sham" exception to *Noerr-Pennington*—Merck's responses to the FDA Form 483 and Warning Letter, and its BPDRs.[2] *See* Pls.' Summ. J. Opp. 57 (arguing these three submissions were not petitioning activity). The Court's holding that these submissions, like the others, were petitioning activity should have been dispositive, especially because Plaintiffs never disputed that these three communications were submitted in a *non-adjudicatory* context.

Merck is aware of no court that has ever applied the sham exception to non-adjudicatory agency communications. Plaintiffs have not identified any such decision, and the Court's Antitrust Decision does not either. The limitation of the sham exception to adjudicatory proceedings makes

---

[2] A BPDR is a submission to FDA by which a manufacturer reports certain events in the manufacturing of a product, including "an unexpected or unforeseeable event that may affect the . . . potency of that product." 21 C.F.R. § 600.14(b)(1)(ii) (2022).

sense: Adjudicatory proceedings, such as litigation in court and citizen petitions, have clearly defined standards and rules, so there is a way for a court (or jury) to judge whether a submission was in fact objectively baseless and thus submitted to abuse the *process* instead of the *outcome*. *See, e.g.*, *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 273 (3d Cir. 2017) (applying sham exception to citizen petition to prevent FDA approval of a competitor's product); *In re Flonase Antitrust Litig.*, 795 F. Supp. 2d 300, 310 (E.D. Pa. 2011) (same).[3] Even among adjudicatory proceedings, however, courts in this Circuit and elsewhere have recognized that there is a hierarchy—citizen petitions are "less susceptible than lawsuits to the sham exception." Antitrust Decision 25 (citation omitted) (citing decisions from the Second Circuit, Southern District of New York, and the Eastern District of Pennsylvania). But the Petitions here are nothing like Citizens Petitions and thus are not susceptible to the sham exception at all.

In this regard, the Seventh Circuit has made explicit what the Third Circuit's precedent illustrates: The sham "exception does not apply at all outside of adjudicative proceedings." *Mercatus Grp.*, 641 F.3d at 848. And as the Ninth Circuit has explained, there are "few, if any," objective standards "against which to measure [a] defendant's conduct" outside of the adjudicatory context, making it difficult to assess whether the conduct is a sham. *Kottle*, 146 F.3d at 1061.

The Court never addressed why or how the sham exception could apply to non-adjudicatory activity like responding to an FDA Form 483 or reporting a potency problem via a BPDR. That issue warrants reconsideration. There is no basis on which a jury could ever find that responding to an agency's questions following an inspection or reporting a product deviation to an agency can be "an attempt to interfere directly with the business relationships of" a competitor. *Wellbutrin*,

---

[3] Citizen petitions are governed by clearly defined rules set forth in the Code of Federal Regulations. *See* 21 C.F.R. § 10.30 (2022). These rules cover a petition's content, the submission process, adjudication procedures, and the timing and content of a decision. *See id.* No such procedures are codified with respect to the FDA submissions that Plaintiffs challenge here.

868 F.3d at 148. The Petitions were not in the context of proceedings that bear any of the hallmarks of adjudicatory proceedings. *See Mercatus Grp.*, 641 F.3d at 844-47 (laying out relevant factors). Indeed, FDA's decision-making based on the Petitions is "not guided by enforceable, definite standards subject to review." *Id.* at 848.

This Court's failure to test whether the Petitions were submitted in an adjudicatory context thereby triggering the sham exception warrants reconsideration. *See Fidelity Fed. Sav. & Loan Ass'n v. Felicetti*, 813 F. Supp. 332, 335 (E.D. Pa. 1993) (granting reconsideration after original decision did not consider necessary element of legal test). On reconsideration, this Court should hold that, because the submissions at issue were not made in the context of an adjudicatory proceeding, the sham exception to the *Noerr-Pennington* doctrine does not apply as a matter of law.

### B. The Alleged Misstatements by Merck to FDA Cannot—As a Matter of Law—Satisfy the Sham Exception's "Objectively Baseless" Requirement.

The FCA Decision shows that none of Merck's alleged misstatements to FDA could satisfy the sham exception as a matter of law, for two reasons.

*First*, objectively baseless means that "no reasonable [party] could realistically expect to succeed on the merits." Antitrust Decision 24-25 (citation omitted). But Merck not only realistically *expected* to succeed on the merits—it *did* succeed. In the context of this case, the objectively baseless inquiry asks whether Merck could have reasonably or realistically expected to retain the statements on its label that Plaintiffs say were false and misleading—i.e., the potency, shelf-life, and seroconversion statements. As the FCA Decision shows, FDA has been made fully aware of everything that Relators say was wrong about Merck's communications with FDA, and FDA has taken no action to revise those statements on the label. Plaintiffs' arguments merely

parrot the same objections to Merck's submissions that Relators made in the FCA case, and which led to no action by FDA in response.

The materiality of an alleged misrepresentation is a critical component of both an FCA claim and the sham exception to *Noerr-Pennington*. Just as materiality in the FCA context asks whether an alleged falsity would have mattered to the government, see *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 181 (2016), an alleged misstatement in *Noerr-Pennington* protected petitioning activity is only a sham if it is so objectively baseless that "no reasonable litigant could realistically expect success on the merits." *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 122 (3d Cir. 1999) (quoting *Professional Real Est. Inv., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (1993)). As the Third Circuit explained in *Cheminor Drugs*, a party's alleged misrepresentation in a submission to the government does not necessarily mean that that submission is objectively baseless and thus a sham. *See id.* at 122-24. Instead, "misrepresentations must be *material* to bar *Noerr-Pennington* immunity" under the sham exception. *Id.* at 124 n.12.[4] "If the government's action was not dependent upon the misrepresented information, the misrepresented information was not material and did not go to the core of [the party's] petition." *Id.* at 124.

Because the FCA and the antitrust cases invoke the same facts to claim Merck's label was false and misleading—which allegedly caused the claims to CDC to be false and caused FDA to delay GSK's entry into the market—the same lack of materiality undercuts both as a matter of law. In the FCA case, Relators contend that Merck's submissions led to false or misleading labels, ultimately leading to FCA liability. *See* FCA Decision 23-24 (explaining that Relators' theory of falsity is that Merck's labels, which were based on data submitted to FDA, were false and

---

[4] Other circuits agree. *See Mercatus Grp.*, 641 F.3d at 843 (collecting cases from the Fourth, Ninth, and Sixth Circuits).

misleading). The Court found that any asserted falsity in the label is immaterial, based in part on FDA's inaction to order any changes to the label or take any other action when faced with all the facts in this case. *Id.* at 30 (citing, *inter alia*, 21 U.S.C. § 355(o)(4)(A)). Plaintiffs, for their part, allege that Merck's submissions create a dispute of fact as to whether its label was false and misleading, which caused FDA to complicate GSK's regulatory approval. Antitrust Decision 14.

This Court's conclusion in the FCA case that Merck's alleged misrepresentations are immaterial under the FCA means that, as a matter of law, those alleged misrepresentations are immaterial under the sham exception to *Noerr-Pennington*. If those alleged misrepresentations were not "persuasive" enough for FDA to change its labelling decisions, FCA Decision at 33, then FDA's decisions with regards to Merck's submissions were by definition "not dependent upon the misrepresented information," as required by Third Circuit law. *Cheminor Drugs*, 168 F.3d at 124.

The second reason this Court's FCA Decision is relevant to the sham exception is that it confirms Merck's petitioning activity was successful and thus not a sham. As the Third Circuit has explained, the sham exception analysis "*requires* consideration, *inter alia*, of the outcome of the proceedings." *Id.* (emphasis added). This accords with the law of other circuits, which have concluded that a lawsuit cannot be objectively baseless when the defendant prevails. *E.g.*, *Kottle*, 146 F.3d at 1063 (holding the "party's advocacy before the Department was not objectively baseless because [the party] prevailed"). Whatever success looks like in this context, Merck achieved it: FDA took no adverse action based on the Petitions; it ultimately granted Merck's application to lower the potency statement on its MMR-II label; it granted Merck's application for ProQuad; and it has not requested any change to any of the so-called false and misleading statements on which Plaintiffs' claims depend, notwithstanding Dr. Kessler specifically asking FDA to do so. The FCA decision makes clear that FDA *continues* to stand by its decisions,

confirming the legitimacy of Merck's successful advocacy. As with materiality, then, the FCA Decision answers *Cheminor*'s "outcome" question in favor of Merck.

The Antitrust Decision overlooks the governing case *Cheminor Drugs* and the effect of the immateriality conclusion in the FCA Decision for Plaintiffs' attempt to invoke the sham exception. As in the FCA case, even "assuming *arguendo*" there was some misstatement in one of Merck's submissions to FDA, FCA Decision 24, the undisputed facts show any such misstatement was not material, would not have led to a different label, and therefore would not have led FDA to require a different non-inferiority showing by GSK. There can be no sham exception as a matter of law on these facts. In this context it is irrelevant whether and the extent to which Merck disputed some of the predicate facts of its communications with FDA in the dueling statements of undisputed facts. Because only a genuine issue of *material* fact can defeat summary judgment, and many of the supposedly undisputed facts that Plaintiffs offered as a basis to defeat summary judgment could not create a genuine issue of material fact as to *Noerr-Pennington* or the sham exception, Merck was not obligated to take them head-on.[5]

In short, no *factual* dispute regarding the predicate facts of the underlying petitioning activity can overcome the *legal* conclusion that Merck's petitions were not objectively baseless because any falsity was not material to FDA's decision-making and because Merck's petitioning

5 This Court's reliance on *Merck's* position when analyzing the sham exception was error. Plaintiffs bear the burden "to show that a defendant engaged in sham litigation." *Wellbutrin*, 868 F.3d at 149; *see also PRE*, 508 U.S. at 61 (placing the burden on the plaintiff); *Federal Trade Comm'n v. AbbVie Inc.*, 976 F.3d 327, 361 (3d Cir. 2020) (same). This Court was thus obligated to consider whether *Plaintiffs* adduced sufficient evidence to create a genuine dispute of material fact as to whether Merck's submissions were so baseless as to constitute shams and thus not qualify for *Noerr-Pennington* immunity. This Court misplaced the burden by focusing on what *Merck* offered, which is clear error under both Third Circuit and Supreme Court precedent. Under the correct standard, it is apparent that Plaintiffs failed to come forward with evidence that the Petitions were objectively baseless.

activity was, and remains, successful.[6] Absent reconsideration, the decision puts to a jury the issue of whether Merck's alleged misrepresentations were material to FDA's decision-making—the very issue on which the Court has already correctly ruled as a matter of law in the FCA Decision. On reconsideration, this Court should hold that Merck's Petitions are immune from antitrust liability under the *Noerr-Pennington* doctrine.

## II. Reconsideration Is Warranted on the Court's Conclusion That Plaintiffs Raised a Genuine Issue of Material Fact on Antitrust Injury.

Reconsideration is also warranted as to the Court's conclusion that there is a triable issue as to antitrust injury here. Plaintiffs' antitrust injury theory is that, absent Merck's alleged anticompetitive conduct, (1) FDA would "likely" have lowered the bar for regulatory approval and (2) GSK would have entered the market earlier. *See* Pls.' Summ. J. Opp. 40-44. The Court focused on the second step in its Antitrust Decision, but the FCA Decision shows that Plaintiffs cannot establish antitrust injury in this case because their first step fails as a matter of law.

Every antitrust plaintiff must show a "causal connection between the purportedly unlawful conduct and [its] injury." *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 265 (3d Cir. 1998). "That a regulatory or legislative bar can break the chain of causation in an antitrust case is beyond fair dispute." *Wellbutrin*, 868 F.3d at 165. Courts routinely find antitrust injury lacking when a regulatory barrier is a cause of the plaintiff's inability to enter the market. *See, e.g.*, *In re Canadian Imp. Antitrust Litig.*, 470 F.3d 785, 791 (8th Cir. 2006); *RSA Media, Inc. v. AK Media*

---

[6] The Court also overlooked that "sham petitioning entails 'the use of the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon.'" *Armstrong Surgical Ctr., Inc. v. Armstrong Cnty. Mem'l Hosp.*, 185 F.3d 154, 158 (3d Cir. 1999) (quoting *PRE*, 508 U.S. at 61). "[T]he sham petitioning exception [thus] does not apply in a case . . . where the plaintiff has not alleged that the petitioning conduct was for any purpose other than obtaining favorable government action." *Id.* No facts show that Merck's invocation of the *process* of communicating with FDA via the Petitions was anticompetitive; Plaintiffs' objection is to the *outcome* Merck sought. For this reason, too, this Court should grant reconsideration and hold the sham exception inapplicable.

*Grp., Inc.*, 260 F.3d 10, 15 (1st Cir. 2001); *City of Pittsburgh*, 147 F.3d at 268. Where regulatory approval is a prerequisite to entering the market, antitrust plaintiffs must "produce evidence from which a reasonable jury could conclude that it is more likely than not that [the competitor] ***would have*** obtained" that regulatory approval absent the challenged conduct "[i]n order to withstand summary judgment." *Wellbutrin*, 868 F.3d at 167 (emphasis added); *see also In re Mallinckrodt PLC*, 638 B.R. 57, 72-75 (D. Del. 2021) (concluding FDA's "regulatory barrier broke the chain of causation" and that plaintiffs "were unable to prove that the harm they experienced was connected to and in fact caused by the Debtors' alleged anticompetitive conduct").

Plaintiffs cannot show that FDA "would have" approved of GSK's Priorix earlier absent Merck's allegedly anticompetitive conduct because their theory of antitrust injury turns on an allegation that this Court rejected in the FCA Decision: the claim that Merck's label was false and misleading in a way that would have affected FDA's decision-making. As the Court recognized, Plaintiffs argued that there was a genuine dispute of material fact as to whether Merck "maintained false and misleading statements on the mumps vaccines labels" and "failed to disclose potency failures." Antitrust Decision 31. But the FCA Decision rejects that Merck's label has any false and misleading statements on it, because FDA would be required to act if it did. 21 U.S.C. § 355(o)(4)(A).[7] As this Court correctly found in the FCA case, the FDA's consistent determination

---

[7] In addition, the FCA Decision means that these consolidated cases no longer include a related suit filed on behalf of the United States. As a result, Plaintiffs' suit is additionally precluded by the clear statutory proscription against private citizen lawsuits seeking to enforce the federal Food Drug and Cosmetics Act ("FDCA"). *See* 21 U.S.C. § 337(a) (actions seeking to enforce the terms of the FDCA "shall be by and in the name of the United States"). In applying this statute, courts determine whether a suit seeks to enforce or restrain a violation of the FDCA based on the substance of the factual components of the plaintiff's case, not the plaintiff's formal styling of the cause of action. This is true irrespective of whether the plaintiff sues for damages under federal or state law. *See, e.g.*, *Sandoz Pharms. v. Richardson-Vicks*, 902 F.2d 222, 230-32 (3d Cir. 1990) (holding that suit seeking recovery under Lanham Act was grounded in allegation that defendant's product labeling did not comply with FDA definitions); *Buckman Co. v. Plaintiffs' Legal Comm.*,

not to require any of the Plaintiffs' suggested label changes in the face of all the evidence that has been presented to the agency reveals that FDA does not view Merck's label as containing any false statement. *See* FCA Decision 27-30, 33. Setting aside Plaintiffs' theories, "[t]he *reality* is that the Government does have knowledge of all of the facts, but these facts were simply not persuasive to . . . prompt them to take any action." *Id.* at 33 (emphasis added).

In the Antitrust Decision, this Court stated that "while a jury may well conclude that . . . the FDA decision-making process break[s] the chain of causation, whether" that process is "the proximate cause of Plaintiffs' injury is a question of fact for the jury." Antitrust Decision 32. But the fact that FDA, even with knowledge of the relevant evidence adduced by Plaintiffs in discovery, has required no revision to the seroconversion rate identified on Merck's label cannot be reconciled with the Court's conclusion in the Antitrust Decision that a jury could find Merck's alleged "seroconversion fraud" was the proximate cause of Plaintiffs' injury. If—as Plaintiffs claim—GSK's supposedly delayed market entry turned on its inability to mirror the seroconversion rate or clinical endpoints on Merck's label, then Merck's conduct was not the cause of Plaintiff's injury because that statement is still on Merck's label now and FDA has taken no action to show it believes that rate to be inaccurate. Plaintiffs therefore cannot prove that FDA would have acted any differently with respect to the clinical endpoint FDA required that GSK's clinical studies needed to meet.

The Third Circuit's decision in *Wellbutrin* illustrates the strictness of the causation inquiry and how FDA's decision regarding Merck's label breaks the causal chain so that Plaintiffs cannot establish antitrust injury based on Merck's interactions with FDA. 868 F.3d at 145. The defendant

531 U.S. 341, 350-53 (2001) (holding that plaintiffs' suit seeking recovery under state common law was grounded in allegation that defendant defrauded FDA when seeking approval of medical device).

there (GSK) obtained FDA approval for a drug marketed as "Wellbutrin." After generic manufacturers filed applications requesting FDA authorization to market generic versions of Wellbutrin, the parties entered into an alleged pay-for-delay settlement, wherein the defendant agreed to not launch its own authorized generic version of the drug for several months and, in return, the generic manufacturers would delay their own launch of a low dosage generic version of the drug. *Id.* at 146, 162. The plaintiffs filed suit, alleging that the defendants conspired with generic manufacturers to prevent a generic version of the drug from entering the market. *Id.* at 146. But the Third Circuit held that because there was a patent blocking the generic versions' launch, the settlement agreement did not cause the injury. *Id.* at 165. Put differently, the Third Circuit explained that the plaintiffs were unable to prove that "but for" the defendants' settlement agreement the generic drug would have entered the market, since a patent blocking the generic versions would have nevertheless created the same effect. *Id.*at 165-66.

Plaintiffs here—like the plaintiffs in *Wellbutrin*—cannot prove that "but for" Merck's alleged inflation of the seroconversion on the label, GSK's Priorix would have made an earlier market entry, because even after FDA learned of Merck's actions, FDA did not require lowering the seroconversion rate on Merck's label. Merck's allegedly anticompetitive conduct therefore did not cause the Plaintiffs' injury; a government regulatory decision did. Plaintiffs therefore cannot "withstand summary judgment." *Wellbutrin*, 868 F.3d at 167.

Neither the evidence this Court pointed to supposedly raising a genuine issue of material fact as to antitrust injury, nor Plaintiffs' expert Dr. Copmann, can overcome Plaintiffs' failure as a matter of law to show that FDA "would have" changed its behavior in the but-for world. The evidence this Court relied upon, *see* Antitrust Decision 31-32, does not bear on FDA's decision-making process. And Dr. Copmann's opinion fails to address the fact that FDA has all the relevant

evidence and has not asked for a label change. Rather, Dr. Copmann speculates futilely that if the label *was* different, then "[t]his would have *likely resulted in the FDA taking a more flexible approach* in reaching an agreement with GSK." *Id.* at 42 (citations omitted). But Dr. Copmann's alternate universe positing is inconsistent with the fact that FDA has not done anything, even after receiving the submission from Plaintiffs' expert, Dr. Kessler. Given that indisputable fact, Plaintiffs have no evidence to support the conclusion that FDA "*would have*" done anything different with GSK in the but-for world, which is the applicable standard.

## III. In the Alternative, This Court Should Certify Its Antitrust Decision for Interlocutory Appeal Under 28 U.S.C. § 1292(b).

The Court's expansion of *Noerr-Pennington*'s sham exception to cover non-adjudicatory, successful petitioning activity and its antitrust injury holding both satisfy the three-part standard to certify the ruling for interlocutory appeal, should the Court not grant reconsideration. The sham holding "involves a 'controlling question of law'"; numerous decisions limiting the exception's scope to unsuccessful and adjudicatory petitioning create "a 'substantial ground for a difference of opinion' as to the order's correctness"; and given its impact on whether this case proceeds to class certification, trial, or to judgment, "an immediate appeal will 'materially advance the ultimate termination of the litigation.'" *Bush*, 629 F. Supp. 2d at 474 (quoting *Katz*, 496 F.2d at 754). The same is true for the Court's antitrust injury holding.

### A. This Court's *Noerr-Pennington* Holding Warrants Certifying the Antitrust Decision for Immediate Appeal.

*First*, whether the sham exception to the *Noerr-Pennington* doctrine can apply in a non-adjudicatory context on which the petitioning party is successful in effectively lobbying for a particular outcome is a controlling question of law. "The Third Circuit has interpreted the meaning of a 'controlling question of law' broadly." *L.R. v. Manheim Twp. Sch. Dist.*, 540 F. Supp. 2d 603, 610 (E.D. Pa. 2008). According to the Third Circuit, a "controlling question of law" is one that

"would be reversible error on final appeal" or is "serious to the conduct of the litigation, either practically or legally." *Katz*, 496 F.2d at 755. "[O]n the practical level, saving of time of the district court and of expense to the litigants" is a "highly relevant factor." *Id.*; *see also, e.g.*, *Knipe*, 583 F. Supp. 2d at 599 ("[A] controlling question of law is one that 'has the potential of substantially accelerating disposition of the litigation.'" (quoting 19 James W. Moore, et al., Moore's Federal Practice ¶ 203.31[3] (3d ed. 2003))).

This Court's holding that Merck's non-adjudicatory and successful petitioning activity in the Petitions could have been so objectively baseless as to constitute a sham is "serious to the conduct of the litigation." *Katz*, 496 F.2d at 755. Absent an interlocutory appeal, "the litigants [will face] the significant expense and delay of unnecessarily" proceeding through class certification and potentially holding a jury trial on a slew of complicated questions. *L.R.*, 540 F. Supp. 2d at 610 .[8] In contrast, allowing the Third Circuit to resolve conclusively if the sham exception applies at all in this context "has the potential of substantially accelerating disposition of the litigation," *Knipe*, 583 F. Supp. 2d at 599 (quoting 19 MOORE'S FEDERAL PRACTICE ¶ 203.31[3]), by taking questions about Merck's petitioning activity with FDA off the table, which would effectively end this case. *See LM Gen. Ins. Co. v. LeBrun*, No. CV 19-2144-KSM, 2020 WL 7770233, at *6 (E.D. Pa. Dec. 30, 2020) (holding issue was controlling issue of law because, if reversed by the Third Circuit, there would be only one "question remaining" in the case). The exceptional importance of this question underscores the need for prompt review. This Court's decision marks the first time a court has extended the sham exception to *Noerr-Pennington*

[8] The fact that this trial would involve complex public health issues—and that Plaintiffs would be asking a jury to reach a different conclusion than FDA has reached—raises the stakes further. Absent an interlocutory appeal, the jury's findings could conflict with FDA's actions in the real world. Indeed, the possibility of such conflicts is precisely why Congress precluded private parties from bringing actions like this, *see* note 7 supra, and also why an interlocutory appeal would advance the interests of the parties and the public.

immunity to non-adjudicatory and successful petitioning activity. The Third Circuit should have the opportunity to promptly review that question; otherwise this Court's decision has the strong potential to chill discourse with a regulatory agency or the public for fear that commentary about a marketplace or a company's own product could subject the speaker to treble damage antitrust lawsuits.

*Second*, there is a "substantial ground for difference of opinion," 28 U.S.C. § 1292(b), as to whether the sham exception can apply outside of the adjudicatory context or to successful petitioning activity. As courts in this district have recognized, "a 'substantial ground' may be demonstrated by adducing conflicting and contradictory opinions of courts which have ruled on the issue." *Pereira v. Foot Locker, Inc.*, No. 07-cv-2157, 2010 WL 300027, at *4 (E.D. Pa. Jan. 25, 2010) (quoting *Oyster v. Johns-Manville Corp.*, 568 F. Supp. 83, 86 (E.D. Pa. 1983)); *see also In re Chocolate Confectionary Antitrust Litig.*, 607 F. Supp. 2d 701, 706 (M.D. Pa. 2009) ("The existence of conflicting judicial opinions provides support for certification of an appeal.").

This Court's opinion that the sham exception can apply outside of the adjudicatory context is in sharp conflict with the Seventh Circuit's decision in *Mercatus*, where that court held that the sham "exception does not apply at all outside of adjudicative proceedings." 641 F.3d at 844. The court then discussed, at length, various factors courts must consider when determining whether a proceeding is sufficiently adjudicatory such that the sham exception can apply. *See id.* at 844-47. The key factor, according to the Seventh Circuit, is whether the agency's decision is "guided by enforceable, definite standards subject to review." *Id.* at 848. Applying those factors, the Seventh Circuit in *Mercatus* concluded that the sham exception did not apply—and thus "*Noerr-Pennington* immunity applies"—because the proceeding at issue was not adjudicatory. *Id.* at 849.

Under *Mercatus*, the proceedings at issue here are not adjudicatory. There are *no* "enforceable, definite standards," *id.* at 848, by which this Court can review the legitimacy of the petitions. Instead, FDA's responses to Merck's submissions were "matters of discretionary authority." *Id.* at 846. Had this case arisen in the Seventh Circuit, then, the district court would have concluded that the sham exception does not apply and that all of Merck's submissions are protected under the *Noerr-Pennington* doctrine. That is as clear a difference of opinion as there can be, thus satisfying § 1292(b)'s second requirement. *Cf. Florence v. Bd. of Chosen Freeholders*, 657 F. Supp. 2d 504, 508 (D.N.J. 2009) (circuit split indicates substantial grounds for difference of opinion); *Bedoya v. Am. Eagle Express*, No. 14-cv-2811, 2017 WL 4330351, at *3 (D.N.J. Sept. 29, 2017) (same).

There is likewise a substantial ground for difference of opinion as to whether successful petitioning activity can—as a matter of law—be so objectively baseless as to constitute a sham. The Third Circuit and other courts have directed that "the outcome of the proceedings" is a crucial part of the inquiry, *Cheminor Drugs*, 168 F.3d at 124, and that petitioning activity cannot be objectively baseless if the defendant prevails, *e.g.*, *Kottle*, 146 F.3d at 1063. There is no dispute that FDA required no change to the seroconversion rate on Merck's label and took no adverse action against Merck based on any of the Petitions that Plaintiffs say were a sham.

*Third*, an immediate appeal of this issue will "materially advance the ultimate termination of the litigation." *Katz*, 496 F.2d at 754. "This requirement is 'closely tied to the requirement that the order involve a controlling question of law.'" *Knipe*, 583 F. Supp. 2d at 600 (quoting 16 Charles A. Wright, et al. FEDERAL PRACTICE AND PROCEDURE § 3930, 423 (2d ed. 1996)). When considering whether an issue will materially advance the ultimate termination of the litigation, courts consider, among other things, "(1) whether the need for trial would be eliminated; (2)

whether the trial would be simplified by the elimination of complex issues; and (3) whether discovery could be conducted more expeditiously and at less expense to the parties." *Id.* (citation omitted).

Reversal of the sham exception on appeal will conclusively resolve a complex and case-dispositive issue. In light of the voluminous discovery produced in this case thus far, the complicated subject matter, and the "novel" theory of harm presented by Plaintiffs, Merck expects that, after complex class certification proceedings, "the trial of this matter will be long and complicated." *Id.* at 601. Conclusively resolving the *Noerr-Pennington* issue will end this case altogether, as the only remaining theory that Plaintiffs could advance would be based on Merck's non-petitioning public statements. In that regard, the Court's finding that FDA has tacitly affirmed the accuracy of the label by declining to require any corrections, in spite of having full knowledge of all the evidence of alleged fraud, precludes any of Merck's relevant public statements from being inaccurate, let alone inaccurate in a way that frustrated competition.[9] Interlocutory appeal thus has the potential to end the case and "spare time and expense for both Court and litigants." *Id.*

### B. This Court's Antitrust Injury Holding Warrants Certifying the Antitrust Decision for Immediate Appeal.

This Court's holding that genuine issues of material fact exists as to whether Plaintiffs can establish antitrust injury also warrants certifying the Antitrust Decision for immediate appeal. *First*, antitrust injury is a controlling question of law: "If the Third Circuit were to disagree with

[9] Plaintiffs' argument based on "public statements" appears almost as an afterthought as a one-page section on page 64 of its Summary Judgment response brief. Pls.' Summ. J. Opp. at 64. It does not cite a single specific public statement that Plaintiffs intend to put at issue before a jury. Regardless, in an abundance of caution, Merck addresses the argument here to note that *none* of Merck's relevant public statements can be false if FDA does not view the label as false and misleading—as the FCA Decision shows is the case.

this Court's ruling, the summary judgment order would be reversed." *Knipe*, 583 F. Supp. 2d at 599; *see Katz*, 496 F.2d at 755 (a "controlling question of law" is one that "would be reversible error on final appeal"). *Second*, there is substantial ground for difference of opinion as to whether Plaintiffs can avoid summary judgment without evidence that FDA would have changed the standards GSK was required to meet absent the challenged conduct. *See Wellbutrin*, 868 F.3d at 167; *In re Mallinckrodt*, 638 B.R. at 72-75. And *third*, because this Court entered summary judgment for Merck on Plaintiffs' state-law claims, entry of summary judgment in favor of Merck on the federal antitrust claims would do more than "materially advance the ultimate termination of litigation," 28 U.S.C. § 1292(b)—it will actually end this case. *See, e.g.*, *Knipe*, 583 F. Supp. 2d at 601 (finding this requirement satisfied when appellate reversal will lead to "the entire case" being "dismissed").

* * *

All three of section 1292(b)'s requirements are satisfied. Should the Court not grant reconsideration and enter summary judgment in favor of Merck, this Court should certify its Order denying summary judgment for interlocutory appeal on the above-referenced issues.

## CONCLUSION

For these reasons, this Court should grant reconsideration and enter summary judgment in favor of Merck. Alternatively, this Court should issue an order certifying the Antitrust Decision for interlocutory appeal or amend the Antitrust Decision to so state.

August 10, 2023

Respectfully submitted,

*/s/ Lisa C. Dykstra*

Lisa C. Dykstra
R. Brendan Fee
Zachary M. Johns
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone: 215-963-5000
lisa.dykstra@morganlewis.com
brendan.fee@morganlewis.com
zachary.johns@morganlewis.com

Dino S. Sangiamo
Sally W. Bryan
Kathleen Hardway
VENABLE LLP
750 E. Pratt Street, Suite 900
Baltimore, MD 21202
Telephone: 410-244-7400
DSSangiamo@Venable.com
SRBryan@Venable.com

*Counsel for Defendant*
*Merck Sharp & Dohme LLC*
*(f/k/a Merck & Co., Inc.)*