# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: MERCK MUMPS VACCINE
ANTITRUST LITIGATION

Master File No. 2:12-cv-03555(CFK)

THIS DOCUMENT RELATES TO:
ALL ACTIONS

**PLAINTIFFS' REDACTED PRESENTATION USED DURING THE JANUARY 24, 2023
ORAL ARGUMENT ON DEFENDANT, MERCK'S MOTION FOR SUMMARY
JUDGMENT AND ACCOMPANYING TEXTUAL DEPOSITION EXCERPTS OF
DAVID KESSLER**

Plaintiffs respectfully submit: (1) Plaintiffs' redacted PowerPoint Presentation Slide Deck

("Presentation") used during the January 24, 2023 oral argument on Merck's motion for

summary judgment; and (2) the textual excerpts of the Deposition Transcript of David Kessler

dated September 28, 2018, cited in the video testimony in slides 7, 10 and 29 of Plaintiffs'

Presentation.

# Summary Judgment

*In re: Merck Mumps Vaccine Antitrust Class Action*

# Factual Evidence

# The Standards For Complying With Labels



**§ 201.56 Requirements on content and format of labeling for human prescription drug and biological products.**

(a) *General requirements.* Prescription drug labeling described in § 201.100(d) must meet the following general requirements:

(2) The labeling must be informative and accurate and neither promotional in tone nor false or misleading in any particular. In accordance with §§ 314.70 and 601.12 of this chapter, the labeling must be updated when new information becomes available that causes the labeling to become inaccurate, false, or misleading.

21 C.F.R. §§ 201.56(a)(2)

3

# Sample MMR Label



In these studies, a single injection of the vaccine induced measles hemagglutination-inhibition (HI) antibodies in 95%, mumps neutralizing antibodies in 96%, and rubella HI antibodies in 99% of susceptible persons.

Each 0.5 mL dose contains not less than…20,000 $TCID_{50}$ of mumps virus

Ex. 119 (MRK-CHA01449029-30)

4

# Merck Failed to Meet Specifications on its Labels

FDA 483 observation 3
Regarding the Mumps Virus Vaccine Live stability data, your response indicated the stability profile of each lot was within the expected range based on historical trends. Products must meet their specifications, not the historical trend throughout the labeled expiry period.

Ex. 124 (MRK-CHA00071265 at '402)

The firm did not adhere to the commitment made pursuant to the approval of the license

Ex. 126 (MRK-CHA00071265 at '265)

5

# Merck's Ongoing Potency Failures
# And Its Failure to Disclose Them to the FDA

**Mar. 5, 2001**
Dr. Margolskee sends update on "sub-potent vaccine(s)" referencing "risk assessment" "stability analyses" and "further steps"

**Feb. 2001**
Dr. Margolskee identifies 225 lots at risk, provides analysis "prelude to potential product recall"

**Product Recall?**

**Kessler Depo**
"I could assure you ... had Merck ... [been] forthcoming that 23 million doses were below specification ... bells would have been set off at the [FDA]."

**Feb. 9, 2001**
FDA issued Warning Letter to Merck referencing 10 lots of Mumps Vaccine that did not comply with the minimum potency specification

**Mar. 8, 2001**
Merck's final response **did not mention these lots,** and represented to the FDA that there was no longer a potency problem

**Mar.-Apr., 2001**
Merck sent the FDA two BPDRs and reported similar potency problems but again represented that the Overfill solved the problem, stating that all "products have end-expiry specifications consistent with their label" and "**all corrective actions necessary to meet label claim compliance** [were] taken."

**Oct. 11, 2000**
FDA catches Merck for failing to report over a dozen sub-potent lots

6

# Kessler Testimony



Ex. 4 (Kessler Dep.) at 225:9-17

# Merck's Possible Strategies

**Option 1.** Shorten the 24-Month Shelf Life on its label to maintain a 4.3 Potency Claim through expiry;

**Option 2.** Lower the 96% Seroconversion Claim on its label to reflect the results of neutralization testing; or

**Option 3.** Manipulate its testing to assure 96% seroconversion at lower potencies, avoiding any need to revise the 24-Month Shelf Life or Seroconversion claims on its label that it knew was unsupported.

Ex. 84 (MRK-CHA01727942 at '42-44); Ex. 88 (MRK-CHA00040705 at 26-27); Ex. 90 (MRK-CHA00615147 at '156); Ex. 263 – MRK-CHA00000032); Ex. 245 (MRK-CHA0002441 at '567-69)

8

# Merck Asks this Court to Ignore the Following Evidence from its Own Documents

- "[R]elax[ing] the criteria of success would lower the bar for the competition and **facilitate [GSK's] entry** into the U.S. market."

- "MMRII is under **imminent threat** of a major competitive launch."

- "[L]owering the seroconversion rate in the label would help GSK."

- "Label change UNDESIRABLE at the present time."

- "[A key Merck committee] recommended that we do not broaden the SCR [seroconversion rate] ... since **broadening the range would open the door wider for competition.**"

- "The objectives of the Marketing element for MMRII Competitive Defense are to:...Pursue a proactive tactical plan including initiatives to **delay and disrupt the launch of Priorix** into the market" (MRK-CHA00285276 at '279)

- Competitive Defense Task Force **"has succeeded in 'raising the bar' for the competition** at every available opportunity."

- **"Objective achieved – Priorix never launched in US"**

Ex. 113 (MRK-CHA00025831 at slide 27); Ex. 81 (MRK-CHA00285276 at '278, '279, '281, '283); Ex. 186 (MRK-CHA00020420 at slide 1) (emphasis in original); Ex.116 (MRK-CHA00020412 at '412); Ex. 212 (MRK-CHA00527025 at '025)

9

# Merck Needed to Maintain the Claims on its Labels to Keep GSK Out of the Market



Ex. 4 (Kessler Dep.) at 363:4-12

# Changing the Label or Lowering the Shelf Life Would Have Eased GSK's Entry

An adjustment to the shelf life of M-M-R®II from 24 to 18 or 12 months will have a commercial impact on the business in several ways:

- Domestic and international increased product write offs due to heightened customer returns and shortened inventory management time frames,
- International loss of share due to a competitive disadvantage (competitors at 24 months)

Ex. 86 (MRK-CHA00019225 at '242)

- Estimated* shelf-life with 4.3 log $TCID_{50}$ is **< 12 months, a potentially non-marketable shelf life**

Ex. 113 (MRK-CHA00025831 at slide 20)

If this is not resolved and doesn't change → label may have to be changed from 96% to 75% (concern if Smith Kline has better sensitivity and higher seroconversion rates – competition??

Ex. 218 (MRK-CHA00198869 at '869)

11

# Merck Needed to Maintain the Claims on its Labels to Keep GSK Out of the Market

127.    Internal discussions at GSK in 2010 further underscore that clinical development was being hampered because of the lack of a serological endpoint. The goal, as stated by GSK, was to match the Merck package insert and to demonstrate "immunological non-inferiority to the licensed competitor."[182]

255.    GSK also provided testimony that its clinical development program was designed to "mirror" the studies on Merck's M-M-R II label.[306]

256.    If Merck disclosed that it did not have clinically meaningful or reliable data to reflect protection from disease to support its product labels, CBER would have been more flexible in accepting an assay from GSK that demonstrated non-inferiority.

Ex. 18 (Copmann Rep.)

# Merck Needed to Maintain the Claims on its Labels to Keep GSK Out of the Market

2. the disease to be treated is a contagious illness that poses serious consequences to the health of others (e.g., sexually transmitted diseases).

Statement Regarding the Demonstrations of Effectiveness of Human Drug Products and Devices, 60 Fed Reg 39180 at 39180-81 (notice August 1, 1995) (emphasis added).

> 375.    In my opinion, the claims set forth in Merck's MMRII and ProQuad labels could and do impact the standards for relative effectiveness that other manufacturers would have to meet to obtain FDA approval to market similar products in the United States.

Ex. 39 (Kessler Rep.)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

493

13

# Merck Needed to Maintain the Claims on its Labels to Keep GSK Out of the Market



Ex. 16 (Cohen Dep.) at 97:2-8

# Merck Needed to Maintain the Claims on its Labels to Keep GSK Out of the Market



Ex. 16 (Cohen Dep.) at 35:17-24

# GSK's Inability to Mirror Merck's False Label Claims Caused GSK's Delay



Ex. 43 (GSK-MMR-0202523 at '524)

# GSK Spent Two Decades Trying to Mirror Merck's Misleading Label Claims To Enter the U.S. Market



# Applicable Law

# Merck's Arguments for Summary Judgment Fail Because:

There are **material factual disputes** as to:

1. Whether Merck's anticompetitive conduct **caused** GSK's delay in entering the Mumps Vaccine market in the U.S.; and

2. Whether the **Noerr-Pennington** doctrine **immunizes** Merck's false and misleading statements on its Mumps Vaccine *labels*.

19

# GSK Was Willing And Prepared To Enter The Market

- Merck does not dispute that GSK was ready and prepared to sell Priorix in the U.S.

- Evidence demonstrates that GSK was ready and prepared to enter the U.S. market for Mumps Vaccine:

    ☑ had previously launched competing pediatric vaccine products;

    ☑ had manufacturing facilities, distribution networks or other equipment and resources in place;

    ☑ possessed a familiarity with the FDA approval process;

    ☑ was a well-established manufacturer; and

    ☑ Competes with the U.S. monopolist (Merck) in the same product market elsewhere in the world.

*See Roxane Labs.*, 2010 WL 331704, at *4; *Fleer Corp.*, 415 F. Supp. at 179; *Tawfilis v. Allergan*, 157 F. Supp. 3d at 866-67.

## Merck Asks this Court to Ignore the Following Evidence from its Own Documents

- "[R]elax[ing] the criteria of success would lower the bar for the competition and **facilitate [GSK's] entry** into the U.S. market."

- "MMRII is under **imminent threat** of a major competitive launch."

- "[L]owering the seroconversion rate in the label would help GSK."

- "Label change UNDESIRABLE at the present time."

- "[A key Merck committee] recommended that we do not broaden the SCR [seroconversion rate] … since **broadening the range would open the door wider for competition.**"

- "The objectives of the Marketing element for MMRII Competitive Defense are to:…Pursue a proactive tactical plan including initiatives to **delay and disrupt the launch of Priorix** into the market" (MRK-CHA00285276 at '279)

- Competitive Defense Task Force **"has succeeded in 'raising the bar' for the competition** at every available opportunity."

- **"Objective achieved – Priorix never launched in US"**

Ex. 113 (MRK-CHA00025831 at slide 27); Ex. 81 (MRK-CHA00285276 at '278, '279, '281, '283); Ex. 186 (MRK-CHA00020420 at slide 1) (emphasis in original); Ex.116 (MRK-CHA00020412 at '412); Ex. 212 (MRK-CHA00527025 at '025)

21

# GSK Spent Two Decades Trying to Mirror Merck's Misleading Label Claims To Enter the U.S. Market



Ex. 16 (Cohen Dep.) at 28: 8-16; 30:17-20; (Cohen Dep.) at 105:9-13; 76: 2-5

# Plaintiffs Are Not Required To:

- Resolve factual disputes, including proving that GSK's inability to mirror Merck's label was the <u>only</u> cause of GSK's delay in entering the market

  > "It is enough that the illegality is shown to be a material cause of the injury; a *plaintiff need not exhaust all possible alternative sources of injury*[.]" *Zenith*, 395 U.S. at 114 n.9 (emphasis added).

  > "[T]he presence of the requisite causation is normally a question of fact for the jury." *Rivas*, 365 F.3d at 193.

# GSK's Actions Were Foreseeable Consequences

> Decisions by GSK and the FDA were foreseeable and intended consequences of Merck's anticompetitive conduct. *See Fleer Corp.*, 415 F. Supp. at 180; *Flonase II,* 798 F. Supp. 2d at 628; *Bristol-Myers Squibb*, 90 F. Supp. 2d at 545.

24

# *Noerr-Pennington* Doctrine

*Noerr-Pennington* generally immunizes antitrust liability of "[a] party that exercises its **First Amendment** right to petition the government for redress" to deter chilling effects on First Amendment rights.

*See Flonase I*, 795 F. Supp. 2d at 309 (citing *Cheminor Drugs*, 168 F.3d at 122) (internal alterations omitted); Merck Mem. at 15-16 (citing *PRE*, 508 U.S. at 56–57 and *A.D. Bedell Wholesale*, 263 F.3d at 250).

# No Court Has Ever Applied *Noerr-Pennington* To Immunize:

- A company's false or misleading statements about its *own* products, especially its label; or

- Outside the political or adjudicatory arena; or

- Where the truthful information was concealed from the government; or

- The competitor did not know about the concealment, nor did it have an opportunity to advocate for itself.

## No Case Law Applies *Noerr-Pennington* to a Defendant's Misleading Statements About Its *Own* Products in a Non-Public Forum

- *Cheminor Drugs*, 168 F.3d at 121-127 (granting *Noerr* immunity where the defendant **petitioned** the relevant government agencies for redress due to the **competitor's** unlawful dumping of ibuprofen and sale at less than fair value).

- *Armstrong*, 185 F.3d at 163-164 (granting *Noerr* immunity where the defendants filed **petitions** opposing the **competitor's** application in an "open process" and the **competitor** was provided "extensive opportunities for correction.").

- *Omni*, 499 U.S. at 368, 381 (granting *Noerr* immunity where the defendant **petitioned** the local government to enact a local ordinance that imposed restrictions on the size, location, and spacing of **competing** billboards, and the government held a series of public hearings and numerous meetings with both the defendant and the **competitor**).

- *Flonase I,* 795 F. Supp. 2d at 310 (denying *Noerr* immunity under the sham exception where the defendant filed **citizen petitions** requesting the FDA to deny the **competitor's** Abbreviated New Drug Application and raise the standards for approval that the agency applies).

- *Lipitor*, 868 F.3d 231, at 273 (denying *Noerr* immunity under the sham exception where the defendant submitted a **citizen petition** to the FDA regarding the inferiority of an active ingredient in a **competitor's** drug).

27

# Merck's Misrepresentations to the FDA Are Evidence of its Intent to Exclude GSK

"The plaintiff is not seeking civil liability for the defendants' petitioning efforts . . . . Nor is the plaintiff trying to base her cause of action on the defendants' petitioning activities. . . . Instead, the **plaintiff seeks to offer evidence** about how the defendants attempted to influence, petition, or communicate with . . . the FDA to show their **knowledge**, state of mind, or intent. **It would be a stretch to say that** *Noerr-Pennington* **bars any use of any evidence of . . . any communications with the FDA.**"

*In re Tylenol (Acetaminophen) Mktg., Sales Practices & Prods. Liab. Litig.*, 181 F. Supp. 3d at 305-306 (internal citations omitted) (emphasis added).

28

# Kessler Testimony



Ex. 4 (Kessler Dep.) at 260:10-24

# DEPOSITION EXCERPT OF DAVID KESSLER

# (CITED IN SLIDE 7 OF PLAINTIFFS' PRESENTATION)

Page 225

1    the Bates number out for us too so that we all have it

2    for this number.

3              MS. HARDWAY:  Sure.

4              (Deposition Exhibit 29 was marked for

5              identification.)

6              MS. HARDWAY:  Exhibit 29, Dr. Kessler, for

7    the record is MRKKRA00783949.

8              MS. SCANLAN:  Thank you.

9              THE WITNESS:  So to answer your question, in

10   response to this 483, FDA did not take enforcement

11   action, but in part, Merck told FDA, "No problem.  The

12   vast majority of measurements for this lot met minimum

13   specification.  I could -- you know, I could assure

14   you, ma'am, that had Merck said in this response, and

15   was forthcoming, that 23 million doses were below

16   specification for '98, '99 time limit, bells would

17   have been set off at the agency.

18   BY MS. HARDWAY:

19        Q.  First of all, Dr. Kessler, nowhere in that

20   response does Merck say, "no problem"; correct?

21        A.  You're talking -- you're minimizing all other

22   reconstituted and store potency for the same lot at

23   24 months were at or above the specification limit.

24   This showed that a lot was not atypical; right?  This

25   was supported by the manufacturer investigation.  And

# DEPOSITION EXCERPT OF DAVID KESSLER

# (CITED IN SLIDE 10 OF PLAINTIFFS' PRESENTATION)

```
1    M-M-R II label to be misleading, correct?
2         A.  You'd have to ask.  I mean, there's been
3    no -- there's been no public statements to that
4    that I'm -- that I have seen whatsoever.  The
5    label says that their clinical studies have
6    supported 96 percent, and that's what it holds
7    GSK to and others to.
8              And by doing that, again, Merck has --
9    Merck has stood in the way of GSK and others to
10   meet a standard which it, itself, could not
11   meet, except for the logic and the information
12   that the company provided FDA.
13        Q.  The FDA approved the ProQuad label when
14   they approved the license for ProQuad, right?
15        A.  Yes, ma'am.  Again, on the basis of the
16   WT ELISA and the same flawed logic that Merck
17   represented.
18              (Kessler Deposition Exhibit 44 marked
19              for identification and attached to the
20              transcript.)
21   BY MS. HARDWAY:
22        Q.  Exhibit 44, Dr. Kessler, is the --
23        A.  I don't have that.
24        Q.  I'm sorry.
25        A.  Oh, I'm sorry.  I do have it.  Not
```

# DEPOSITION EXCERPT OF DAVID KESSLER

# (CITED IN SLIDE 29 OF PLAINTIFFS' PRESENTATION)

Page 260

1          A.   No.   I'm telling you based on my review of
2     all these documents.   I mean what I cannot fathom is
3     why Merck wasn't forthcoming and just put a true shelf
4     life on this product.   And what the record shows is
5     Merck did not want to do that for competitive reasons.
6     That's what the record shows.   It's in multiple
7     documents that I have read.
8          Q.   Dr. Kessler, you cannot testify as to what
9     any one person within Merck thought or felt; right?
10         A.   I will not testify with regard to subjective
11    evidence, but I certainly am prepared to testify that
12    it makes no -- that it makes no sense of why this
13    product was not appropriately dated and why Merck
14    insisted on having this at 24 months, and Merck stated
15    reasons and let the evidence speak for itself, and it
16    can.   That was for competitive reasons.   There's no
17    explanation for that.
18              They didn't want to let someone else into
19    this field.   That's the problem.
20         Q.   Dr. Kessler, I haven't asked you a question.
21         A.   I understand, but the problem is you didn't
22    want to let anyone else into this field.   You stood in
23    the way -- right? -- for competitive reasons, and you
24    set back the field 20 years.
25         Q.   Is that an opinion that you're adding to your